## S. C. JENNINGS v. THE STATE.

### No. 1926. Decided May 31, 1900.

**1. Murder—Evidence—Wife's Declarations—Res Gestae.**

On a trial for the murder of his stepson, the State's witnesses were asked, "What, if anything, did the wife of defendant say immediately after the firing of the shot?" to which the answer was, she said, "You have killed my darling boy," and defendant replied, "G—d d—n your darling." The evidence was objected to because the wife had not been introduced as a witness, and her declarations could not be used against the husband, they being privileged communications. Held, the declarations of defendant were res gestae, and the declaration of his wife was admissible for the purpose of a full understanding of his declaration.

**2. Witness—Animus Towards Defendant—Impeachment.**

Where a witness has admitted in full measure his hatred of defendant, it is not error to refuse to permit him to be impeached as to some particular declaration he may have made that would merely show his animus.

**3. Murder—Defendant as a Witness.**

On a trial for murder of his stepson, where the defendant became a witness in his own behalf, it was incompetent to prove by him how many times he had been married and the causes which brought about his separation from his wives, the purpose of the evidence being only to discredit him and make it appear that he was a bad man else his wives would not have quit him.

**4. Hurtful Evidence—Practice on Appeal.**

Where the tendency of inadmissible evidence could only prove hurtful to defendant, the only safe rule is to reverse the judgment.

**5. Murder—Charge—Provoking Difficulty.**

On a trial for murder, where the charge of the court fully submits the law of self-defense and provoking the difficulty as applicable to the case, it can not be complained of for failing to single out acts of provocation on which the charge of provoking the difficulty was predicated. Brooks, Judge, dissenting.

APPEAL from the District Court of Lamar. Tried below before HON. E. D. McCLELLAN.

Appeal from a conviction of murder in the second degree; penalty, ten years imprisonment in the penitentiary.

The indictment charged appellant with the murder of Davie Wiggins on the 21st day of November, 1898, by shooting him with a pistol.

The following statement of the case, which is substantially correct, is taken from the brief of counsel for appellant:

The case practically and substantially stated is, that appellant, S. C. Jennings, married old lady Wiggins in September, 1898, and it seems that her boys, deceased, Jim and Jerry, didn't like it. All of them lived for a short while in the same house, when separation became necessary and the appellant and his wife and Jim and his wife and her son Jerry and his son Monroe moved a short distance away, some eighty yards. The deceased used the garden spot in which to

feed his stock, and just west of the garden was a lot which appellant used. In going from appellant's house to his lot he had to pass by the deceased's as well as the garden. There seems to have been a feed box which both parties claimed, the State's contention being that it belonged to the deceased, and he used it in the garden to feed his horses out of. The appellant's contention is that the box belonged to him and that he purchased it some time before that in Honey Grove and had paid the fabulous sum of five cents for it. The night before the homicide the defendant's son passed by the house of deceased and overheard a threat of deceased to break his father's neck; this threat he communicated to his father the same night,—the wife of deceased, however, denied this threat.

Appellant got up early next morning and slopped his hogs, returning therefrom to his house, and says that deceased saw him and threw his grubbing hoe at him and set up something in the corner of the fence he took to be a gun. This alarmed him, and, coupled with the threats, and having to return to his lot to feed his stock, he went to the seed house and got his pistol, which he put there some two weeks before, and started on down to his lot to feed his stock, it then being light enough to see, and having to pass right by the garden, saw the deceased on the inside of the garden shucking corn and was using the feed box that he thought was at that time in his lot, and the idea occurred to him to step in and get his box.

Up to this point there is no stated difference as to how the appellant got into the garden or why he went into it that is worthy of notice— but from the time he entered the garden and during the time of the homicide, what occurred is not agreed to. The wife of deceased and Jerry literally agree that appellant walked up to where the deceased was near the box and said: "Davie, I come after my box," and Davie said, "You can't have it," when appellant reached for the box with one hand and struck Davie at the same time with the other and only with his fist. Davie picked up a stick there in the lot and hit appellant over the head, the blow knocking him down against the fence, and he got up and he and Davie were fighting with their fists, when Monroe (the son) grabbed Davie, and Davie said, "I can't fight both of you," and started out of the garden, when appellant then drew his pistol and fired. Just as he fired, Davie looked back and was stooping forward, as though to dodge the shot. At this point Jerry says he (deceased) was running from appellant and looking back at him at the time the pistol fired, and deceased fell in the garden gate. At this point Mrs. Wiggins, wife of the deceased, says that her husband, "as the pistol fired, looked back and stooped, as though to shield his head. He was in a stooping attitude when the pistol fired." Both of these witnesses agree that as the deceased fell Mrs. Jennings (mother of the deceased) said, "You have killed my darling boy," and appellant replied, "God damn your darling boy." And deceased was six or eight feet from appellant when he was shot. The ball entered in

the left side of the back about three inches from the backbone and about six inches above the hip joint.

Luther Nance did not see any of the parties until he saw the deceased in a stooping position when appellant fired. Deceased had his head turned and was looking backward when the pistol fired. This witness, with the other two witnesses, say they never saw an ax at the gate, but will not say that there was not one there. On cross-examination Nance said: "Appellant immediately shot the deceased upon drawing his pistol. Deceased was about half bent when appellant fired. Deceased's hand was hanging straight down and almost touched the ground when the pistol fired. If there had been an ax on the ground his hand would almost have touched it."

Maggie Wiggins, daughter of the appellant, after the shooting saw appellant with a box in one hand and a pistol in the other coming from deceased's house. He put the box down and said, "I will have my box if I have to kill every God damn one of them." Soon thereafter her father was shot in the leg from a gun fired from deceased's house. The animus of this witness, although the daughter, was clearly shown by her admission on cross-examination that "she wrote her husband, who was put in jail for shooting at appellant, and told him that she was sorry she could not be with him, but in the absence of such a comfort she had the pleasure of sitting in the window, the place where he stood when he shot pa." The animus of Jerry Wiggins is shown in his cross-examination wherein he informed the trial court that he was a "graduate in the art of cussing," and had been practicing on his step-daddy, appellant, ever since he knew him; says he hated the appellant, and if he could send him to the penitentiary by swearing against him he would do it and he would be glad to see him go to the penitentiary on his testimony. However, he denied saying to Tom Stephens, or anyone else, that he would kill appellant if he married his (Jerry's) mammy.

For the defense Monroe said that on the morning of the kililng he met his father returning from slopping the hogs and was told by him of deceased throwing the grubbing hoe at him and having the Winchester. Appellant was going to the lot to feed his stock, and saw his box and stepped in and said, "Davie, I come after my box," and Davie said, "Take it," and as appellant stooped to pick up the box deceased reached behind him and picked up a grubbing hoe or pick handle and hit him across the head and shoulders and knocked him down; and then they clinched and fell, and got up, and were about six or eight feet from the garden gate. Deceased "broke loose from appellant and started hurriedly towards the gate, and as he got in the gate stooped to pick up an ax that was lying just on the threshold of the gate and a little to one side and with the handle towards the deceased and his hand was just grabbing the ax handle when the appellant drew his pistol and fired." And deceased said as he fell, "If I had got that ax I would have thrown it through him." Appellant did not draw or attempt to draw his pistol until the deceased was in the act of picking up the ax. It was deceased's purpose to leave home that morning for the West, and he had

heard him say he intended killing appellant before he left, and he had communicated this threat also to appellant. Appellant, when he stopped at the garden, was going the usual way to the lot. The box belonged to appellant, but his manner was kind when he asked deceased for it. It was the box they had to feed in and it was needed that morning. He denies the language attributed to his stepmother as deceased fell, and also denies the language attributed to his father by his sister.

Appellant's testimony is a full and succinct statement of the homicide. He substantially tells the occurrences about the box and the shooting as told by his son Monroe. "I never thought of stopping en route to the lot to feed my horses, as I thought the box was at the lot, until," as he says, as he was passing the lot and saw deceased feeding his horses in his box and "Thinks I to myself I'll go in and get my box, as I will need it to feed in. I walked in at the garden gate and went around deceased and said, 'Davie, I want my box,' and he said, 'Take it,' and as I reached down to pick it up with my right hand I received a blow on my head and shoulders that knocked me down." He then tells of the clinching and fist fight and that deceased broke loose from him and made for the ax, and as he stooped to grab it, fearing a successful attack on his life, drew his pistol and fired. He denies the language used by his wife and that claimed by his daughter to have been used by him. He disclaimed any purpose except a peaceful one in asking for and getting the box.

On cross-examination, over the objection of his counsel, he was made to say that he had been married three times, first wife died, second wife quit him, and third wife got a divorce from him since he killed her son, the deceased.

Appellant offered to prove by Tom Stephens that Jerry Wiggins told him that if he (appellant) married his mammy he would kill him.

The foregoing is substantially the evidence.

*Stillwell H. Russell,* for appellant.

*Rob't A. John,* Assistant Attorney-General, for the State.

HENDERSON, Judge.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of ten years.

Appellant objected to eliciting from certain State's witnesses a conversation between defendant and his wife which occurred at the time of the homicide. The question propounded by the district attorney was as follows: "What, if anything, did the wife of defendant say immediately after the firing of the shot?" And each of the State's witnesses in answer to said question stated that the wife of defendant said to defendant, "You have killed my darling boy;" and defendant replied to her by saying, "God damn your darling boy." Appellant objected to this testimony on the ground that it was a declaration by

defendant's wife drawn out by the State during the examination in chief of said witnesses concerning a matter which the defendant had not inquired about. Appellant also claimed it was incompetent, because the wife of defendant had not been put on the stand as a witness in his behalf, and that she could not be examined herself, and that her declarations were inadmissible as against her husband. The court overruled these objections on the ground that it was a part of the res gestae of the homicide, and, further, for the purpose of showing which boy defendant referred to when he replied, "God damn your darling boy." Appellant appears to apprehend that conversations of husband and wife heard by other persons are inadmissible on the ground that the same are in some manner privileged communications. Such is not our understanding. The declaration of defendant at the time of the shooting or immediately afterwards, to wit, "God damn your darling boy," was admissible as a part of the res gestae and as showing his animus, and what his wife said to elicit this was admissible for the purpose of a full understanding of his declaration.

Appellant also objected to the refusal of the court to permit him to prove by Tom Stevens that on a certain occasion he heard Jerry Wiggins, who had been used as a witness for the State, say that "if his [Jerry's] mother married that damned old son of a bitch Jennings [defendant in this case] he would kill him." Appellant insisted that this testimony was admissible for the purpose of contradicting the State's witness Jerry Wiggins, who swore on cross-examination (the predicate being laid) that he did not make such statement to Tom Stevens or in his presence. The court in excluding this testimony held that the witness Jerry Wiggins had admitted his animus and ill will against appellant, and that it was not competent to pursue the inquiry, and impeach the witness on an immaterial matter. Appellant, on the other hand, claimed "that this proof was admissible for the reason that the witness Jerry Wiggins had denied making the statement attributed to him, and proof that he did make it would go to his credibility, and tend to impeach him; that the predicate laid was twofold in object and purpose. If Jerry admitted the threat, it would go to the weight to be given to his testimony, because of his animus, and his denial would impeach his credibility." An examination of this witness' testimony shows that he frankly admitted he hated appellant; that he had always hated him, and would like to send him to the penitentiary. Now, while it is always admissible to show a witness' animus towards a defendant against whom he testified, yet it occurs to us that, the witness having admitted in full measure his hatred towards defendant, it would not constitute reversible error to refuse to permit the witness to be impeached about some declaration which he may have made that would merely show his animus.

Defendant testified on his own behalf, and the district attorney on cross-examination asked him how many wives he had had, and proved by him that he had had three wives; that the first one died, the second quit him, and the third obtained a divorce from him. The district

attorney further asked him why the second one quit him, and if the third one did not get a divorce from him on the ground that he had killed her son. This question was objected to by appellant, and the objection sustained by the court. Appellant objected to all this proceeding on the ground that the testimony was irrelevant and immaterial, and did not tend to prove any issue in the case; that appellant had not testified concerning said matters, and that it tended to hurt defendant, and prejudice the jury against him, as it involved an inquiry into the acts, conduct, and statements of persons who were at the time the wives of defendant, and was calculated to make the jury believe that the second wife quit him because of wrongs and injuries committed by him; and that the third wife obtained a divorce from him was easily understood by the jury as being equivalent to proof that her reason for doing so was that defendant in her belief was actuated by malice in killing her son. As explained by the court, the district attorney was not permitted to press his question, and show why his said second wife quit him, and his third wife got a divorce from him; but he was permitted to show that his second wife had quit him, and that his third wife had obtained a divorce from him. And in that connection it transpired before the jury that the State desired to prove that the third wife got a divorce from him on the ground that he had killed her son. But, even if this question had not been asked, the conclusion would have been almost irresistible that the cause of the divorce of his last wife was on account of said killing of her son. The jury had been apprised by the testimony that he was married to his last wife, who was the mother of deceased (deceased being his stepson), at the time of the homicide, and, inasmuch as appellant at the time of the trial was divorced from her, that it must be on account of the homicide, which would inevitably suggest to the jury the opinion of his wife, who otherwise could not testify against him, that in her view appellant had killed deceased without a cause. Furthermore, as to the second wife, as to whom he was compelled to testify that she quit him, the natural effect would be to suggest to the jury that there was something wrong in his conduct or she would not have quit him. None of this testimony had anything to do with this case. The quitting of his second wife and the divorce from his last wife were not admissible in the case, unless it was legitimate testimony to discredit or impeach him. We believe the extent to which the authorities go in this direction is that on cross-examination it can be shown by appellant, when he becomes a witness on his own behalf, that he has been accused of some crime or offense, either a felony or a misdemeanor, which imputes moral turpitude. Carroll v. State, 32 Texas Crim. Rep., 431; Brittain v. State, 36 Texas Crim. Rep., 406. Of course, it can not be contended that this character of testimony would come under that head. There is another class of cases which holds that, where a witness follows some vocation or occupation disreputable or immoral, that can be shown on cross-examination as going to the credit of the witness. McCray v. State, 38 Texas Crim. Rep.,

609. It can not be shown that a witness is in the habit of associating with lewd women or immoral persons. Hudson v. State, 41 Texas Crim. Rep., 453. This testimony did not show the witness' vocation or calling, but involved acts of other persons, as against defendant, as to the propriety of which we are not advised. Evidently this character of evidence was introduced for the purpose of discrediting appellant as a witness,—as showing that he must be a very bad man, else his wives would not have quit him. But it was not admissible under any rule of testimony with which we are familiar. Its tendency could only prove hurtful to appellant, and, when this is the case, the only safe rule is to reverse the judgment.

In the motion for new trial appellant took a number of exceptions to the charge of the court. Among others, he criticises the charge for failing to single out the acts of provocation on which the charge of provoking the difficulty was predicated. We have examined said charge and it is an admirable presentation of the law of self-defense; and in that connection, but as a distinct clause thereof, the court gave a charge on provoking the difficulty. He not only instructed the jury in this respect with reference to provoking a difficulty for the purpose of killing deceased, but also gave a charge on provoking the difficulty without such purpose; and in that connection further told the jury that appellant had the right to go into the lot on a peaceful mission, and get the box, and if he did so without intending to provoke an attack or bring on a difficulty with Wiggins his right of self-defense was complete. An inspection of the charge will show that it is admirably drawn, and the whole trial, as far as we are able to discover, was conducted with that painstaking and patient care by the learned judge who tried the case (who has since deceased) which was so characteristic of him throughout his long and distinguished services on the bench; and, with the exception of the error pointed out as to the admission of the testimony, the case was remarkably well tried. For that error the judgment is reversed and the cause remanded.

*Reversed and remanded.*

BROOKS, JUDGE.—The error upon which this case is reversed is clearly harmless, in the light of this record. I therefore dissent.