## D. R. RICE V. THE STATE.

### No. 3794.   Decided November 6, 1907.

### Rehearing denied, May 13, 1908.

**1.—Murder—Jury and Jury Law—Special Venire.**

Where upon trial for murder objection was made to the venire because one of the State's attorneys, after the venire had been drawn by the clerk and the writ made out and signed by him, assisted the clerk in checking off the list with the list of jurors from which it was drawn. Held, there being no allegation of fraud or irregularity, there was no error.

**2.—Same—Challenge by State.**

Where it was objected by the defense upon trial for murder that certain jurors had not been served, and they were afterwards tendered to defendant, but peremptorily challenged by the State there was no error.

**3.—Same—Diligence—Sheriff's Return.**

Where upon trial for murder, complaint was made that the sheriff's return failed to show diligence with reference to the non-service of certain jurors named in the writ of special venire, and the sheriff's amended return gave the details of his efforts to find the jurors, and that none were omitted on purpose; and that one of the jurors was subsequently brought into court and peremptorily challenged by the State, there was no error. Following Spencer v. State, 48 Texas Crim. Rep., 580.

**4.—Same—Harmless Error—Bill of Exceptions.**

Where upon an appeal from conviction of murder the record showed that the defense had objected to testimony showing the custom of the sheriff in preparing copies of the writ of venire and showing them to counsel, and the bill of exceptions did not show that this testimony threw any light on the legal questions involved, there was no error; and if error the same was harmless.

**5.—Same—Order of Drawing Venire.**

Upon trial for murder where the defense objected to the explanations and testimony of the clerk as to the order in which defendant's venire was made, and that the same was drawn before other special venires were drawn; and

that there was no order of record, etc. Held that defendant had no right under the law to have his venire drawn at any particular time with reference to other murder cases demanding a special venire; and that the law authorized the clerk first to exhaust the regular venire and then go to the special venire.

### 6.—Same—Peremptory Challenge by the State.

Where upon trial for murder the defendant complained of the irregularity of the summons of the veniremen, and the State subsequently peremptorily challenged the juror, there was no error.

### 7.—Same—Challenge for Cause—Reasonable Doubt.

Where upon trial for murder the defendant objected to a juror because the same had stated on his voir dire that he would not acquit defendant unless he proved himself innocent, but the record showed a misconception of the questions propounded to the juror by counsel, and that when the law was explained by the court the juror stated that he would give the defendant the benefit of the reasonable doubt; and that no disqualified juror was permitted to serve on the jury after defendant exhausted his peremptory challenges, there was no error.

### 8.—Same—Change of Venue—Filing Transcript—Nunc Pro Tunc.

The law does not require the clerk of the court to which venue is changed to place his file mark upon the papers; but there was no error upon motion of the State to permit them to be filed nunc pro tunc; besides the law would regard the indictment and transcript filed the day the clerk received the same in his custody.

### 9.—Same—Evidence—Declarations of Deceased—Res Gestæ—Dying˙ Declarations.

Upon trial for murder where the evidence showed strychnine poisoning of the deceased by means of a syringe, which the State claimed the deceased used without knowing that it contained poison and which was caused to be placed therein by defendant, etc., there was no error in admitting in evidence the declarations of deceased made about an hour after she was stricken with the poison in the presence of her husband and others, to the effect that he had poisoned her by placing strychnine in the syringe, and demanded to know of him what he had done with the strychnine he had that morning, etc., and to which defendant answered that he never had it; the deceased having first stated that she was going to die. Following Rice v. State, 49 Texas Crim. Rep., 569.

### 10.—Same—Evidence—Acts of Defendant.

Where upon trial for murder the evidence showed that while the deceased was in the agonies of death from strychnine poisoning, the defendant and others were present, there was no error to admit testimony that the defendant did nothing to alleviate the suffering of the deceased who was his wife, but that he was restless, and that he was doing and saying nothing but simply went in and out of the house, indifferent to the sufferings of the deceased.

### 11.—Same—Evidence—Expert Opinion.

Where upon trial for murder a witness for the State testified that he was a practicing physician, a graduate from a regular school of medicine, etc., there was no error in permitting him to testify that deceased came to her death from strychnine poisoning; and this although he admitted that he had never had any practical experience with a case of strychnine poison.

### 12.—Same—Evidence—Expert Opinion.

Upon trial for murder where the defendant had introduced expert testimony with reference to the manner of administering strychnine poison by means of a fountain syringe, and that the witness had examined the syringe in question and found no traces of strychnine in the same, and that in witness' opinion traces would have been left of the strychnine if it had been placed in water in the syringe, there was no error in permitting the State to show by the same witness that if the poison had been used in such a way as not to come in contact with the water in the bag attached to the syringe, and so placed above the nozzle of the syringe in the end of the tube, that the effect if the syringe was then filled with warm water and an enema taken, would be that the strychnine would be washed out of said tube, and no trace left thereof.

**13.—Same—Evidence—Custom.**

Where upon trial for murder alleged to have been effected by the use of a syringe containing strychnine poison, which syringe the deceased was in the habit of using, and who did not know at the time that there was poison in the syringe, the same being an ordinary syringe, and there was nothing to show how the deceased used it, and it being only circumstantially established how the poison got into the syringe, there was no error in rejecting testimony offered by the defense as to how a syringe of this kind was ordinarily used by one accustomed to its use.

**14.—Same—Evidence—Motive.**

Upon trial for murder there was no error in admitting in evidence that about eighteen months or two years before the death of the deceased, defendant had improper relations with a certain woman; the evidence also showing that the deceased was the wife of the defendant but that they had not been living together on account of these improper relations. This testimony was admissible to show motive.

**15.—Same—Evidence—Materiality of Testimony.**

On trial for murder there was no error in admitting in evidence the conduct of defendant shortly after the death of the deceased, who was his wife, which conduct showed an appointment with a certain woman with whom he had had improper relations before and after the homicide, and whom he had tried to get to send poison to his wife, and whom he had tried to get to leave the country after he was indicted.

**16.—Same—Evidence.**

On trial for murder there was no error to admit testimony that the State's witness, whom the defendant had induced to leave the State, was brought back by an officer and placed in jail; as the same could not injure the defendant.

**17.—Same—Evidence.**

Where upon trial for murder the defense had introduced testimony that the deceased was insane, there was no error to admit in evidence testimony of State's witnesses that she was of sound mind; there being no objection to this testimony on the ground that a proper predicate for its introduction had not been laid.

**18.—Same—Charge of Court.**

Where upon trial for murder the charge of the court complied with the suggestions on a former appeal of the case, and covered all the requested charges, there was no error.

**19.—Same—Murder in the First Degree.**

Where upon trial for murder the evidence showed a cruel and wanton killing, with premeditated malice, a verdict of murder in the first degree assessing life imprisonment was fully warranted.

ON REHEARING.

**20.—Same—Evidence—Husband and Wife—Statutes Construed—Res Gestæ—Dying Declarations.**

Where upon trial for murder the defendant was charged with the killing of his wife by administering poison to her, it is such an offense of the husband against the wife as is contemplated by article 775 Code Criminal Procedure, and her declarations implicating the husband in administering the poison, made shortly before her death in the presence of the defendant and others was admissible against the husband, as res gestæ and dying declarations.

**21.—Same—Evidence—Stating Facts.**

Upon trial for murder, the statements and declarations of deceased made a short while before her death, implicating her husband, the defendant, in administering poison to her by means of a syringe, using among other language the following: "Go away, Ward! Go away, Ward! you know you did it. No longer than this morning you asked me if I used the syringe to-day," to which

defendant made no reply, were admissible, as they stated a fact and not merely the opinion of the witness.

**22.—Same—Evidence—Res Gestæ—Dying Declarations.**

Upon trial for murder there was no error in admitting the testimony of the physician, who attended the deceased just before her death, as to the statements deceased made with reference to the defendant's complicity in the murder, both as res gestæ and dying declarations, although made in the absence of defendant; besides the same statements were substantially made in the presence of the defendant.

**23.—Same—Charge of Court—Limiting Testimony.**

Upon trial for murder where the testimony of the State's witness was corroborative in its character, and could only be used for the purpose for which it was introduced, there was no error in not limiting the same in the court's charge to the jury.

Appeal from the District Court of Hill. Tried below before the Hon. W. C. Wear.

Appeal from a conviction of murder in the first degree; penalty imprisonment in the penitentiary for life.

Leaving out formal averments and the names of the parties the indictment charged: That on or about the 6th day of December, A. D., 1904, and anterior to the presentment of this indictment, one ——— in the County of Johnson and State of Texas did then and there unlawfully with malice aforethought place and caused to be placed a certain deadly poison to wit strychnine in a certain syringe which said syringe the said ——— then and there well knew would be used by one ——— in taking and receiving and injection of water into the rectum, bowels and body of the said ——— and the said ——— then and there well knowing said strychnine to be a deadly poison, knowingly, willfully and maliciously placed and caused to be placed said strychnine into said syringe designedly and with the intent then and there that the said ——— would and should so use said syringe and would therewith and thereby receive said strychnine, and that said strychnine would therewith and thereby be conveyed into the rectum, bowels and body of the said ——— and with the intent then and there to kill the said ——— and that the said ——— not knowing that said strychnine was in said syringe, did then and there use said syringe in taking and receiving an injection of water into her rectum, bowels and body, and said strychnine was then and there, therewith and thereby conveyed into the rectum, bowels and body of the said ——— by said strychnine being so conveyed, taken and received into her rectum, bowels and body of the said ——— did on or about the 6th day of December, A. D., 1904 [die], in the said County and State aforesaid. And the grand jury aforesaid upon their oaths aforesaid do say that the said ——— in manner and form aforesaid unlawfully and with malice aforethought did kill and murder the said ——— against the peace and dignity of the State.

A statement of the facts of this case will be found in the opinion of the court, on former appeal in the 49 Texas Criminal Report, 569.

Judge W. F. Ramsey having entered his disqualification to sit as judge

of the Court of Criminal Appeals in this case, he having been of counsel for appellant, the Governor appointed Hon. Howard F. O'Neal, of Cass County, Texas, as special judge, who rendered the opinion of the court on motion for rehearing.

Counsel for appellant, among other things, contended that this case did not come within the scope of article 775, Code Criminal Procedure, as construed in the cases cited; that in order to permit one spouse to testify against the other there must have been an assault or personal violence by one against the other, and that in a case of administering poison by one to the other, the statute did not apply, and that therefore the declarations of deceased were inadmissible in evidence.

The opinion states the case.

*Odell & Johnson, Ramsey & Odell* and *Hughes & Cummings* for appellant.—On question of impaneling the jury. Harrison v. State, 3 Texas Crim. App., 558; Osborne v. State, 23 Texas Crim. App., 431. On question of admitting the declarations of deceased: Compton v. State, 13 Texas Crim. App., 271; Dill v. State, 1 Texas Crim. App., 278; Overton v. State, 43 Texas, 616; and cases cited in opinion. On question of admitting declarations of deceased in the absence of defendant: Powers v. State, 23 Texas Crim. App., 42; Holt v. State, 9 Texas Crim. App., 571; Good v. State, 18 Texas Crim. App., 39; Bradberry v. State, 22 Texas Crim. App., 273. On question of dying declarations: Bateson v. State, 46 Texas Crim. Rep., 34; 10 Texas Ct. Rep., 208; Madina v. State, 43 Texas Crim. Rep., 52; 63 S. W. Rep., 331; Fulcher v. State, 28 Texas Crim. App., 465. Upon question of expert testimony: Schinck v. Noel, 72 Texas, 1; Vance v. Upton, 66 Texas, 476; 5 Enc. of Ev. 610; Betts v. State, 48 Texas Crim. Rep., 522; 13 Texas Ct. Rep., 885; 1 Wharton Criminal Evidence, section 418.

*F. J. McCord,* Assistant Attorney-General and *Cleveland & Hatnes, Morrow & Smithdeal, W. Spell* and *Poindester & John Clark,* for the State.—On question of impaneling jury: Spencer v. State, 48 Texas Crim. Rep., 580; 90 S. W. Rep., 639, and cases cited in opinion. On question of admitting declarations of deceased: Cases cited in opinion

BROOKS, JUDGE.—Appellant was convicted of murder in the first degree, and his punishment assessed at lifetime imprisonment in the penitentiary.

The former appeal of this case will be found in the 49 Texas Crim. Rep., 569; 16 Texas Ct. Rep., 396.

Appellants bill of exceptions No. 1 complains of error of the court in refusing to quash the venire. The facts in said bill are that a venire was drawn according to the statute of this State; there were seven jury weeks of the term of court at which this venire was drawn, and that thirty men were drawn for each week, aggregating 210 men. There

were three special venire cases on the docket: this one, the State v. Harris, and the State v. Watson.   On the 9th of January the court made an order requiring a special venire in each case, and set the day for the trial of each.   It had been previously agreed that the Rice case should be set for the 4th of February, but the court made no order on the docket to that effect, but on the 9th day of January he did make the order and set the other cases for the 28th and 30th of January respectively.   The district clerk, in drawing the venire, drew that for the Rice case first, and drew it from 210 names on the lists of regular jurors.   After the venire in this case was drawn by the clerk, the writ made out and signed by him, one of the attorneys for the State assisted the clerk in checking off the list with the list of jurors from which it was drawn.   Of this appellant seriously complains, but we do not think there was an error in this.   There is no allegation of fraud, nor insistence that anything was done irregularly, but the complaint seems to be based purely upon the fact that this apprised the State's attorney of who constituted the venire before appellant's counsel knew same.   After the venire list was drawn up, as indicated above, it was subject to the inspection at the instance of any one to whom the sheriff might see fit to show it, and the fact that one of the State's counsel assisted in checking the jurors, would not be a ground for quashing the venire.

The motion complains further of the failure of the court to serve L. J. Garner and Bill Tatum, Sr.   Both of these jurors were subsequently brought into the court and tendered to the defendant and were peremptorily challenged by the State.   The State's challenge of the jurors certainly rendered any irregularity in the service harmless. See Miller v. State, 47 Texas Crim. Rep., 329; 83 S. W. Rep., 393.

The motion complains further of the failure of the court to quash same because the return of the sheriff fails to show diligence with reference to the jurors Sanders, Roach, Sheets, Blunt, Cruse, Taylor, Bailey, Henderson, Helton, Bankston and Chapman.   The sheriff's amended return shows that said jurors were not found in Hill County after diligent search, except the juror Sheets, who had, in fact, been served and was in attendance upon the court, and whose name had been omitted from the return by mistake.   The bill shows that the State subsequently challenged Sheets peremptorily.   The sheriff and his deputies testified before the court, giving the details of the efforts made to find the other jurors.   Their testimony shows that some of these jurors were out of the State; none were omitted purposely; that the sheriff and his deputies had carried a list of the jurors throughout the county making inquiries for them in the neighborhood where they were supposed to live.   After a very careful reading of the matter above complained of, we do not think there was any error in the ruling of the court.   For a discussion of similar matters see Spencer v. State, 48 Texas Crim. Rep., 580; 90 S. W. Rep., 639; and Starr v. State, 86 S. W. Rep., 1023.

In bills Nos. 2 and 3, appellant complains of the ruling of the court

in the following: W. C. Morrow, an attorney practicing at the bar, was asked, "If it was not the custom and habit of the sheriff's office in Hill County, Texas, to prepare copies of the venire and show them to counsel for the defendant before the said venire had been served and returned by the sheriff, and as to whether the sheriff's office had extended such favors in other cases to the said W. C. Morrow." To which question he answered that "such was the custom and such favors had frequently been extended to him in other cases." Appellant objects to the testimony on the ground that any custom that might exist which was unknown to the defendant and his counsel could in no sense be binding upon him. The bill shows that this question and answer did not occur in the presence of the jury. We do not think that the testimony threw any light on the legal question involved in appellant's bill, but it certainly was harmless in any view.

R. E. Sparkman, clerk of the court, after being sworn, was asked to explain why the venire in this case was drawn from the list of jurors for the week instead of from the special venire list, and why said venire was drawn in this case before the venire was drawn in the case of the State v. Hence Watson, which was set for the 28th of January, and the case of the State v. Leggett which was set for the 30th day of January, 1907. The court explained that at the previous term of the court it made an order that this cause be set for trial on the 4th day of February. Appellant objected to said statement on the ground that if an order was made to have any force and legal effect, it must have been in writing and of record, and that the record would be the best evidence, and on the further ground that there was no order of record and that a verbal order could not have any legal force, and that if said order had been made would not authorize the clerk to draw the venire in this case from the list of jurors for the week instead of from the list of special venire as it would have been drawn if the clerk had followed the law with reference to drawing venires. The bill is also approved with the statement that this testimony as introduced in the absence of the jury. We know of no law that guarantees to this appellant the right to have his venire drawn first or last, or at any particular time when there are two other murder cases demanding a venire. The law says that when the clerk in drawing the venire exhausts the regular venire, then he must go to the special venire provided by law. There certainly is no error in the ruling of the court.

Bill of exceptions No. 4 shows that E. Sheets, one of the jurors mentioned above, was peremptorily challenged by the State; the defendant previous to the peremptory challenge complained of the irregularity of the summons. This certainly cures any possible error in the summoning of said Sheets.

Bills of exception Nos.. 8, 10, and 12 complain of the following matters: R. M. Hood, in reference to his qualifications to serve as a juror, answered, as follows, appellant's questions: "Q. Would you re-

quire the doubt in your mind to be very strong before you would acquit or would you acquit him if you had a reasonable doubt? A. I would have to have a mighty reasonable doubt. Q. Would you require defendant to prove that he did not kill her? A. Yes, sir. Q. I mean to say, that after the State has rested, if the State had succeeded in conveying an impression to your mind that the defendant is guilty, then under all the explanation that I have given you, would you require the defendant to establish in your mind that he is innocent, or would you only require of him to introduce evidence that would raise a reasonable doubt in your mind as to whether he was or not? A. I would require him to show evidence that he was not guilty." "That the explanations referred to in the preceding question were made by the court to the juror before said questions were propounded and answers made, which explanation was 'That the defendant was presumed to be innocent until his guilt was established beyond a reasonable doubt and that the defendant was in no event required to prove his innocence, but if the evidence should raise a reasonable doubt in the juror's mind as to whether the defendant was guilty or innocent, he would give the defendant the benefit of the doubt and acquit him.' " Thereafter the following questions were asked by appellant, "And if the State had satisfied you that he was guilty bearing in mind all the explanations stated, that the defendant is not required to prove his innocence after the State has proved he was guilty, you would never turn the defendant aloose until he had proved himself innocent? A. Yes, sir. Q. The mere fact that he would raise a reasonable doubt in your mind as to whether he was guilty or not, you would require more of him than that to prove that he is innocent? A. Yes, sir." Thereupon the court propounded the following questions to said juror Hood: "Q. The law is, if you have a reasonable doubt as to his guilt you would turn him aloose? A. Yes, sir. Q. Would that instruction, if you got in the jury box and hear all the evidence that is admitted before you take the charge of the court and give the defendant a fair and impartial trial and give him the benefit of the doubt all the way through? A. Yes, sir." "Thereupon the defendant challenged peremptorily said juror. The defendant exhausted his peremptory challenges before the jury was selected. The juror Beckham, being the last juror selected, was taken after appellant had exhausted his challenges. The court states, in explanation, that appellant excepted to the juror Beckham without objection, and did not call the court's attention to any objection to him. This being true, we do not think there is any error in the ruling of the court, but hold that the juror was qualified. The answers given to appellant's counsel clearly appear to have been a misconception on the part of the juror of appellant's question, but when the law was explained by the court the juror answered that he would give the defendant the benefit of the reasonable doubt. See Johnson v. State, 49 Texas Crim. Rep., 314; 94 S. W. Rep., 224. Furthermore, no disqualified juror was permitted to serve on the jury after appellant exhausted his chal-

lenge. See Green v. State, 49 Texas Crim. Rep., 645; 98 S. W. Rep., 1059; Mays v. State, 50 Texas Crim. Rep., 165; 96 S. W. Rep., 329, and Woodward v. State, 50 Texas Crim. Rep., 294; 97 S. W. Rep., 499. It has frequently been held by this court that defendant must show that an objectionable juror was forced upon him. See Loggins v. State, 12 Texas Crim. App., 65; Keaton v. State, 41 Texas Crim. Rep., 621, and Green v. State, 49 Texas Crim. Rep., 645; 98 S. W. Rep., 1059. We have carefully reviewed all of appellant's assignments with reference to the organization and drawing of the venire in this case, and must say that we do not think any of his complaints are well founded, but hold that this venire was drawn and the jury was organized in strict conformity with the law and decisions of this court.

The 25th to 30th ground inclusive in the motion for a new trial relates to the action of the court in ordering and allowing the clerk of the District Court of Hill County to place his file mark nunc pro tunc upon the indictment and transcript, and after the indictment was read to the jury it was discovered that the clerk had not placed his file mark upon same. Thereupon, the State filed a motion setting up the fact that the indictment and transcript from the District Court of Johnson County, from which county the venue was changed to Hill County, had been received by the clerk of the District Court of Hill County on December 5th, but that the clerk neglected to put his file mark on them. In support of the motion the clerk testified that the same was received in his court on the 5th of December, and the county attorney instructed him that there was no law authorizing him to file same. Mason Cleveland, County Attorney of Johnson County, testified that the indictment read to the jury was the indictment originally returned by the grand jury of Johnson County. Thereupon, the court permitted the file mark of the clerk to be placed upon it. Article 622 of the Code of Criminal Procedure, provides that when an order for the change of venue is made, the clerk where the prosecution is pending shall make out a transcript of the orders made in the cause, and transmit the same, together with the original papers, to the clerk of the court to which the venue has been changed. We find no provision requiring the clerk of the court to which venue is changed to place his file mark upon the papers, but clearly it was proper to do so at the time of their receipt, but in any event the law would regard the indictment and transcript filed the day the clerk received the same in his custody from the clerk of the District Court of Johnson County. The record shows that the District Clerk of Hill County treated the indictment and transcript as filed papers and docketed the papers and issued process as though they had been filed, and the only thing he neglected is the simple duty of placing his file mark on the papers.

Bills of exception Nos. 15, 16, 17 and 18 complain of the introduction of the testimony of various witnesses who testified to declarations of the deceased, conduct and act of deceased within an hour after the poison had been, through appellant's instrumentality, injected into

her bowels. For a statement of the evidence on this question see the former appeal of this case in the 49 Texas Crim. Rep., 569; 16 Texas Ct. Rep., 396; also see said statement, in substance, for the evidence adduced upon the trial of this case. All the objections urged to this testimony were passed upon by this court in the previous opinion, and we there held that the same came within the clear rules of law and were entirely admissible either as res gestæ, dying declarations or accusations against appellant in his presence. For a discussion of the questions see said opinion. We do not deem it necessary to again review the questions, but adhere to the former decision of this court on all these questions. And for further authorities on the questions, in addition to the opinion above cited, see Holden v. State, 10 Texas Crim. App., 91; Browning v. State, 26 Texas Crim. App., 432; Clement v. State, 22 Texas Crim. App., 23; Jennings v. State, 42 Texas Crim., Rep., 78; 57 S. W. Rep., 642, and Humphrey v. State, 47 Texas Crim. Rep., 262; 83 S. W. Rep., 187. In the case of Tooney v. State, 8 Texas Crim. App., 452, the record shows deceased was found lying at the back of a saloon apparently drunk; one of his pockets was turned wrong side out, and when found the deceased said that, "he was not drunk but had been drugged and dragged out there." We held that said testimony was admissible as res gestæ. In the case of Lewis v. State, 29 Texas Crim. App., 201, it was proved that one hour and a half after deceased had been wounded she stated that, "Joe Lewis had come up behind her while she was at the wash tub, ran his hand under her arm, pulled her back and cut her nearly in two." We held that this statement was admissible as part of the res gestæ. As to what constitutes res gestæ and under what circumstance res gestæ statements and dying declarations are admissible, we cite the following collation of authorities: Castillo v. State, 31 Texas Crim. Rep., 145; Powers v. State, 23 Texas Crim. App., 42; Fulcher v. State, 28 Texas Crim. App., 465; Drake v. State, 29 Texas Crim. App., 265; McKinney v. State, 50 S. W. Rep., 708; (40 Texas Crim. Rep., 372), and Freeman v. State, 51 S. W. Rep., 230; (40 Texas Crim. Rep., 545).

Bill of exceptions No. 19 complains of the following: While Mrs. James Pickett, the State's witness, was on the stand, she was asked the following question: "Q. State whether he (meaning the defendant) was composed or quiet or whether he was restless, getting up and down; state how that was? A. Very restless." Appellant objected to this question and answer on the ground that it was a matter of temperament and was immaterial and irrelevant and inadmissible for any purpose and called for a conclusion of the witness and opinion as to an immaterial matter; that same was calculated to inflame the minds of the jury against appellant. This bill is approved with the explanation that the witness was well acquainted with the defendant; that at the time he was out and in, first one way and then the other, and seemed very restless, unusually restless.

Bill of exceptions No. 20 complains that the State asked the witness

Bowman the following question: "What was his (meaning the defendant) manner as you observed on that occasion (meaning the last illness of his wife shortly before she died) compared with his manner at other times, whether anything usual or unusual? A. Well, I thought it was very unusual. Q. Describe it to the jury. A. Only in this way: He sat there and had nothing to say, and nothing to do; didn't ask a question as to how she felt or what was the matter." This bill is approved with the statement that the witness further testified that deceased was suffering intensely and everybody was at work trying to relieve her in some way and the defendant sat right there and did not say a word to her, how she felt or what was the matter; that the defendant didn't do a thing or say a word to her and he thought that was remarkable, all of which statements made in this explanation were made without objection. Suppose the bills before us should have shown that at the time of the last illness of appellant's wife he (appellant) had been wrought up to an intense frenzy or point of grief and sorrow over the condition of his wife, and this court should hold that said testimony could not be approved as a circumstance to indicate the lack of probable truth in the State's indictment wherein it is alleged that appellant poisoned his wife. Certainly, appellant would have just ground for believing this would be both a cruel and inaccurate ruling of this court. Then surely the converse of the proposition is equally true from the State's standpoint. The record shows before us that deceased was suffering the agonies of death from strychnine poisoning. These witnesses testified in substance that he (appellant) sat by with the utmost complacency and indifference, not even inquiring as to her complaint or the extent of her illness and manifested no concern as to the outcome of her sickness. This is a strong circumstance to show the cruel and reckless disregard that appellant had for the life and safety of his wife. The testimony is clearly admissible.

Bill of exceptions No. 24 complains that Dr. James Pickett was permitted to testify that deceased came to her death from strychnine poison. Appellant objected to his testimony on the ground that he was not qualified as an expert in such a matter and could not therefore give testimony as to his opinion in such matters, and was not qualified, according to his own statement of his knowledge and experience with reference to strychnine poison cases, to give an opinion upon such matters. The witness admitted that he had been practicing medicine for a period of about twenty years; was a graduate of a regular school of medicine, but he never had a case of strychnine poison and never treated one; never had had any practical experience with a case of strychnine in the course of his practice; that the only knowledge he had of strychnine poison, the symptoms and effect upon the human system, was acquired from reading text-books and medical works on the question and what he had learned at school while a student of medicine. This testimony was admissible, and so held by this court in the previous opinion in this case.

Bill of exceptions No. 28 presents the following: While Dr. E. B. Osborne was on the witness stand, in behalf of the State, over appellant's objection, after the witness had been shown the fountain syringe consisting of a rubber bag with a small tube of rubber some four or five feet long, extending from the lower portion of said bag, and a guttapercha or rubber nozzle was shown to have a small opening or barrel which it was shown would contain from five to ten grains of strychnine in its ordinary crystal or pulverized form, the State asked the witness the following question: "Q. Supposing a tube is used as I have described with a nozzle as I have described, the strychnine just above the nozzle in the end of the tube, the clamp above that rendering the crystals in the bottom of the tube entirely away from any water or anything that would dissolve, what, in your opinion would be the effect if the syringe was then filled with warm water and an enema taken, as to whether or not there would be any trace of the strychnine crystals left in the tube? A. I believe that the strychnine would be washed out of the tube immediately, for the reason that whenever you clamp that syringe, that tube above, you are bound to get some air in there, the strychnine would never go in the solution, but the air would blow it out as powder." Appellant objected to the question because same was leading; because there was no semblance of evidence that the strychnine was so placed or that any ordinary person would have known to have placed it there and it is out of the ordinary to place said poison in that way; that there is no evidence that it would be placed or could have been placed in such a way or that the average man would have thought of placing the strychnine in the tube in any such way or manner, and that it calls for the judgment and conclusion and opinion of the witness on a remote, speculative and inconceivable evidence, and that said testimony is prejudicial to the minds of the jury. The court approves the bill with this statement: "The defendant on cross-examination elicited from this witness statements to the effect that he made an examination of the syringe used by the deceased and found no trace of strychnine in same, and that if strychnine had been in the same it was his opinion that traces thereof would have been left. The witness also testified to several experiments he made subsequently with the view of determining whether strychnine placed in water in a syringe would leave traces of the strychnine in the syringe when the water passed out and had found traces remaining. Witness further ventured the opinion that if the deceased had died from strychnine poison she did not get the same through the syringe. Thereupon the State propounded the above and foregoing answers from the witness which the court thought entirely proper under the circumstances." We hold that it was clearly admissible. The State was relying upon the fact that appellant poisoned his wife by placing strychnine in a syringe that she was accustomed to using. Now, the defense had proved by this doctor that he found no strychnine poison remaining in the syringe, and that if any had been placed there some of it would still remain, and certainly

it was admissible for the State to show that it could have been in there under a certain condition and forced out of the syringe, as stated above, without leaving traces of strychnine.

Bill of exceptions No. 29 complains of the refusal of the court to permit Dr. Osborne to testify as to how a syringe of this kind was ordinarily used by one accustomed to its use. The State objected to this on the ground that it was not a question for an expert to give testimony about. We think this testimony was not a matter that an expert could testify about. The record shows that it was an ordinary syringe, and there is nothing here to show how the deceased used it, and it is only circumstantially established as to how the poison got in the syringe, hence there is no error in the ruling of the court.

Bill of exceptions No. 30 shows that while the witness Ollie Shanklin was on the stand for the State, that about eighteen months or two years before the death of the deceased, defendant had improper relations with her, the said Ollie Shanklin. Appellant objected to this testimony on the ground that the relations ceased a year and a half before the death of appellant's wife, therefore, too remote to furnish any ground, motive or suggestion for the defendant to murder his wife; that the only effect of the evidence would be to show that he had maintained casual passing illicit relations and acts with the witness and could throw no light upon any issue in the case. This bill is approved with this explanation: "That it was material to show ill-feeling existed between deceased and defendant and the origin of the trouble and the length of its duration. This witness further testified that the defendant told her that the deceased knew of these improper relations and that she, the deceased, was all the time throwing the witness's name up to him and quarreling with him and that his home was not what it ought to be on that account. Indeed, the defendant proved by E. J. Rice, uncle of the defendant, that the deceased Mrs. Rice told him, the said E. J. Rice, in the summer before the homicide that she and defendant had not lived together as husband and wife for two years. The court is of the opinion that both were admissible as tending to show the cause and the length of time the separation and bad feeling had existed between the two, besides the Court of Criminal Appeals on the former appeal settled this question." This testimony, as stated by the learned judge, was held admissible by the majority of this court on former appeal of this case. If the defendant could have proven that the utmost harmony, love, fealty and fidelity had existed between him and his wife up to the very hour of the homicide, this certainly would have been strong evidence for appellant, and the writer thinks there could be no cavil as to its admissibility. Then, to whatever extent the State can show a lack of good feeling or to whatever extent the State can show bitterness existing between appellant and his wife, and especially when this bitterness comes down to within a year or such matter of the homicide, it is admissible as a circumstance to throw light upon the motive, animus and purpose of appellant.

Bill of exceptions No. 31 shows the State asked the witness L. E.

Berry the following: "I will get you to state whether or not at any time after the death of defendant's wife, the defendant made any request of you to make an appointment with Nellie Long for him to meet her. If so, when was it? The witness testified, in substance, that a few days after the defendant made the request of him he made an appointment with Nellie Long for the defendant to meet her. Appellant objected on the ground that same was illegitimate and improper and could serve no proper purpose in this case, and was prejudicial. This bill is approved with this statement: "In view of the defendant's relations with the witness Nellie Long, both before and after the homicide, that is his living with her before the homicide, her testimony that defendant tried to get her to send poison to his wife in headache powders and as to their mutual arrangement to live together after the death of the deceased and in view of the defendant's conduct in hiring said witness to leave the country after the indictment was found, the court regarded this evidence as material." In the light of this statement the evidence clearly was admissible.

Bill of exceptions No. 32 complains of the introduction of testimony showing, in substance, the following: Nellie Long was asked on cross-examination: "Q. Who brought you from Dalhart to Cleburne? A. Jack Thornton. Q. Do you know what relation he is to Mrs. Amanda Rice? A. He is her brother. Q. When you got to Cleburne what became of you? A. They put me in jail." To this testimony the appellant objected on the ground that the best evidence would be the record; furthermore, appellant objected, unless the record showed that Thornton was an officer and because the act of a prosecuting witness or hostile kinsman of the deceased ought not to be received as evidence against the defendant; that said acts being done in the absence of appellant and are hearsay as to him and to the answer made that she was put in jail when she arrived in Cleburne is not admissible for any purpose, but is wholly immaterial, irrelevant and hearsay. Furthermore, the return on the attachment issued out of the District Court of Johnson County for the witness, Nellie Long, to the sheriff at Dalhart, Texas, shows that said attachment was executed by one Hotton, Sheriff of Dalhart County, Texas. The defendant objects to the testimony of the witness with reference to Jack Thornton's connection with her being brought to Cleburne because it is inadmissible in view of the fact that said attachment and the return thereon shows her to have been brought into court by authority of written process. The court appends this explanation to the bill: "That as a part of the State's case it was material to show where the defendant procured the witness Baldwin and others to carry the witness, Nellie Long, in order to keep her from testifying as a witness on the trial of this case in Johnson County, and it was necessary to identify Nellie Long, the main State's witness, as being the witness attached in Dalhart, Texas, and in order to do this it was permissible to show that Jack Thornton located her in Dalhart, Texas, and brought her back to Cleburne, Texas. The witness Jack

Thornton also testified on the same subject and his evidence is in the record. The evidence further shows that defendant and one Baldwin and one Sigler took Nellie Long to the Indian Territory and that defendant procured the said Baldwin to carry her to Dalhart, Texas, and to remain with her and see that she kept out of the way and away from the County of Johnson until after the day on which defendant's case had been set down for trial." This testimony was all admissible. The fact that she was placed in jail would be a matter that would go to discredit the witness's testimony before the jury, and instead of injuring, could not serve any other purpose than to assist appellant's case, since she testified to the motive for this killing. If she was so infamous or unreliable that she had to be placed in jail to force her to testify, to that extent it weakened the verity of whatever statement she might make, and this is a matter of which appellant could not complain, since it would necessarily redound to his benefit in this trial.

Bill of exceptions No. 37 shows that while the witnesses Mrs. Tolar and Mrs. Pickett were upon the stand they were each asked the following question by the State: "From your acquaintance with the deceased and conversation with her and observation of her have you an opinion as to whether her mind was sound or unsound?" to which questions and answers sought to be elicited, appellant objected on the ground that the defendant had raised no issue of insanity except as to the single matter referred to in a letter introduced in evidence written by the deceased, that matter being with reference to the relations of the defendant and the deceased, and defendant's relations to other women; and on the further ground the testimony was incompetent, irrelevant, immaterial and inadmissible, all of which objections, which are literally copied in this opinion, were overruled by the court, and the witnesses answered: "Perfectly sound." This bill has appended to it the following explanation: "That defendant placed E. J. Rice, uncle of defendant, upon the stand who testified that in June, 1904, deceased visited him in Dallas, Texas, and remained there several days and in speaking of her conduct there the witnesses testified the deceased 'Was perfectly crazy.' He further testified that from his acquaintance and conversation with her he was so alarmed, that he wrote to J. M. Rice, brother of the defendant, at Ranger, Texas, on the subject. This letter of date June 23, 1904, written by E. J. Rice to J. M. Rice was read in evidence. This letter, among other things, recites that deceased had been on a visit to him but he, witness, was sorry to see Mandy, the deceased, crazy, but that she was as crazy as a bed bug and was jealous about Ward being too thick with other women and advised J. M. Rice to go and see defendant, and have him to have the deceased adjudged insane. On cross-examination the witness E. J. Rice repeatedly stated that deceased was crazy on the subject of the property she and the defendant owned, and about the bad women the defendant was running with. In view of this evidence the court allowed the State in rebuttal to introduce the above and foregoing evidence which the court regarded as clearly admissible. It was further shown

in the testimony of E. J. Rice, witness for the defendant, that deceased while in Dallas in June, 1904, threatened to kill herself and her little boy if defendant did not convey to her and her children by deed all his property, and that she was guilty of other acts indicating an insane mind, and in the condition of the record the court admitted the foregoing evidence in rebuttal." It will be seen from an examination of appellant's bill of exceptions that appellant does not complain that the proper predicate was not laid for the introduction of said testimony; that is to say, the bill of exceptions does not complain that the witnesses being non-professional witnesses, that before they could testify they would have to tell the facts upon which their opinion as to insanity of deceased were predicated. We have repeatedly held that where a non-professional witness testifies to the insanity of any one, that before doing so they must rehearse and state the facts upon which they predicate their opinion. The bill does not show whether this was done or not; nor does appellant object to the introduction of this testimony on the ground that it was not done. This being true, we are left then to consider the ball proposition as to whether a non-professional witness can testify to the insanity of the deceased. We hold that they can, and it could not be held irrelevant and immaterial for them to do so in a proper case, like the one at bar.

The charge of the court in this case is a practical copy of the former charge, with such amendments as were suggested on the former appeal of this case, and all the errors pointed out on the former appeal of this case, in the charge of the court, have been cured in the charge in this case. This being true, the charge is clearly correct, and it necessarily follows from this fact that it was not error for the court to refuse any of appellant's charges, since to whatever extent they were applicable, they were covered in the main charge of the court.

This opinion has already gone beyond the length to which we feel called upon to write in these cases, but suffice it to say that this record is without any error authorizing the reversal of this case. It shows a cruel and wanton killing, with premeditated malice on the part of appellant towards her whom appellant had sworn to love, cherish and support through life; the fiendish deliberateness with which the act was accomplished; the diabolical malignity displayed by appellant at the dying bed-side of his wife; his indecent disregard of her memory in seeking an immediate interview with a prostitute who was the sole cause and motive for the murder of his wife, all present to our mind a record with unparalleled brutality and fiendishness that amply warrants the verdict inflicted in this case. And finding no error in the record, the judgment is affirmed.

*Affirmed.*

Henderson, Judge, absent.

## ON REHEARING.

### May 13, 1908.

O'NEAL, SPECIAL JUDGE.—We have carefully considered the motion for rehearing in this case and believe that the opinion heretofore rendered is correct. On this motion we will only consider the points specially called to the attention of the court by motion for rehearing, brief and oral argument of counsel for appellant, as follows:

1. The question raised by bill of exceptions No. 15 with reference to the admissibility of certain testimony detailing the declarations and statements made by the deceased Mrs. Rice immediately before her death, the contention of the defendant being that none of said statements and declarations were admissible either as a part of the res gestæ, dying declarations, or accusations of guilt undenied, for the reason that under our law the deceased being the wife of the defendant at the time said statements were made, are not admissible against him. The wife, if living, could not have been permitted to testify in respect to said matter, and, therefore, her statements and declarations were not admissible under any rule of evidence. We cannot agree to this contention. We do not believe that our Legislature ever intended such a construction when they enacted article 775 of the Code of Criminal Procedure, which provides that: "The husband and wife may in all criminal actions be witnesses for each other, but they shall in no case testify against each other except in a criminal prosecution for an offense committed by one against the other." Our Penal Code is divided into two grand divisions, one is offenses against the person, the other is offenses against property; therefore, it necessarily follows that this case is an offense against the person. We have a special statute, article 647, Penal Code, which provides that: "If any person shall mingle or cause to be mingled any other noxious potion or substance with any drink, food or medicine, with intent to kill or injure any other person, or shall wilfully poison or cause to be poisoned any spring, well, cistern or reservoir of water with such intent, he shall be punished by imprisonment in the penitentiary not less than two nor more than ten years." Now, with the reference to the case of Garnet v. State, 1 Texas Crim App., 605, and relied upon by appellant, on examination it will be found that the case was reversed purely upon the ground that Garnet was charged with an offense denounced by article 647 of the Penal Code above cited, and the trial judge, instead of submitting to the jury the offense described in the indictment, gave to the jury a charge upon an assault with intent to murder, an entirely different offense from that with which the defendant was charged. We believe that the court did right in the reversal of the Garnet case for the reason above stated. It will be observed that in the concluding part of the opinion in the Garnet case, that the court says that a new trial should have been granted upon the ground alone that

the trial court erred in his charge to the jury. We do not understand that the question of an assault was really before the court in the Garnet case. It is true that the court discussed to some extent what it takes to constitute an assault, but the case was reversed solely upon the ground that the appellant was charged with a specific offense, to wit: administering poison, and the judge gave to the jury a charge upon an entirely different offense, to wit: an assault with intent to murder. "In the United States, according to the weight of authority, administering poison or any other harmful drug or substance to a person with intent to inflict injury amounts to an assault." See 2 American and English Encyclopedia of Law, page 960, and cases there cited. It is held by the Supreme Court of Georgia, in the case of Johnson v. State, 17 Southeastern Reporter, page 1070, "Where the accused put a deadly poison into the coffee with the intent and purpose that the same should be drunk by another, who without knowledge of the presence of the poison actually drank of the coffee, the poison was administered to him by the accused, and in so doing the latter committed an assault." See also Commonwealth v. Stratton, 114 Mass., 303; Carr v. State, 135 Indiana, 1. The court in the 114 Mass. say: "Although force and violence are included in all definitions of assault, or assault and battery, yet where there is physical injury to another person, it is sufficient that the cause is set in motion by the defendant or that the person is subjected to its operation by means of any act or control which the defendant exerts," citing Chit. Crim. Law, 799. 1 Cobbett's Crim. Law, 82. 2nd Greenl. Ev., Section 84. We hold that the administering of poison by the husband to the wife is an offense committed against her such as is contemplated by article 775 of the Code of Criminal Procedure, and makes her a competent witness against the husband. We, therefore, hold that the court did not err in permitting the declarations and statements of deceased to the witnesses who testified to the same to go to the jury, both as res gestæ and dying declarations. We do not think that the Miller case in the 37 Texas Crim. Rep., 575, and the Baxter case in the 34 Texas Crim. Rep., 516, are in point in this case. To our minds it is a monstrous doctrine to hold that where the husband poisons the wife that the wife is disqualified, by reason of our statute, to testify against him. We do not believe that our Legislature ever intended such to be the law. It would place the wife at the mercy of the husband. We believe this would be an unreasonable law, such as our law makers never intended, and did not pass.

2. This court has held in two opinions that the testimony of Mrs. Foster, Mrs. Pickett and other witnesses who heard the statements and declarations of deceased a short while before her death,was legal evidence and admissible. Certainly from the form of the statements and declarations as appear in the record it seems that deceased was speaking a fact and not an opinion. The language of the deceased was, "Go away, Ward! Go away, Ward! You know you did it. No longer than this morning you asked me if I used the syringe to-day," to which

defendant made no reply. We understand the rule to be that if the statement be merely an opinion, the testimony would not be admissible, but from the record in this case it appears that deceased spoke a fact that she had knowledge of. It was a short hand rendition of the facts as appears from the record. We take the record as we find it and in this case it appears that she was stating a fact.

3. We think the testimony of Dr. Townes as to statements made to him by the deceased, Mrs. Rice, in the absence of the defendant, was admissible both as res gestæ and dying declarations, besides the same statement was substantially made time and again by deceased in the presence of defendant and not denied by him.

4. We do not think there was any injury done the defendant, or error on the part of the court in failing to limit the testimony of Mason Cleveland. Cleveland's testimony was merely to corroborate the testimony of the women, Long and Taylor, in a statement to him, Cleveland, wherein the defendant had undertaken to contradict them, and we cannot see how any injury resulted to the defendant by a failure of the court to limit same to the purpose for which it was introduced. It is true whenever extraneous matter is admitted in evidence for a specific purpose, incidental to, but which is not admissible directly to prove the main issue, and which might tend, if not explained, to exercise a wrong, undue or improper influence upon the jury as to the main issue, injurious and prejudicial to the rights of a party, then it becomes the duty of the court in his charge to so limit and restrict it that such unwarranted results cannot ensue. The rule requiring the court to limit and restrict the purpose for which testimony has been adduced, does not apply when the admitted testimony proves or tends to prove the main fact. Foster v. State, 32 Texas Crim. Rep., 39; Leeper v. State, 29 Texas Crim. App., 63. It a well-known rule of this court that admitted evidence does not have to be limited by the court in his charge to the jury where said evidence can only be used for the purpose for which it was introduced. This rule applies to both impeaching and corroborating evidence, and Mason Cleveland's evidence was merely corroborative testimony.

We have carefully considered the record in this case, as well as the able brief and oral argument of counsel for appellant, but we are unable to find where the court in its opinion heretofore rendered has committed any error. We, therefore, overrule the motion for rehearing.

*Overruled.*

Davidson, Presiding Judge, dissents.