## J. C. WOODWARD v. THE STATE.

### No. 3491.   Decided October 3, 1906.

**1.—Murder in Second Degree—Continuance—Materiality of Testimony.**

Where upon trial for murder, the testimony set out in defendant's application for continuance did not materially differ from that of the State's witnesses as to what occurred with reference to a disturbance between the deceased and another shortly before the homicide, there was no error in overruling the motion; besides the State offered impeaching affidavit as to the whereabouts of absent witness.

**2.—Same—Motion for New Trial—Newly Discovered Evidence—Discretion of Court.**

Where upon motion for new trial the alleged newly discovered evidence was that previously on the evening of the day of the homicide the deceased inquired about the whereabouts of defendant, but no threat or design on the part of deceased was shown, the same was not material. It is within the sound discretion of the court not to permit a witness to testify who has heard the testimony and where the rule was invoked.

**3.—Same—Special Venire—Bill of Exceptions.**

Where upon appeal from a conviction of murder in the second degree, appellant's bill of exceptions questioned the action of the court in overruling his objection to the special venire list, but did not show that he was injured by drawing therefrom, or that any partial juror was forced upon him on said account, there was no error.

**4.—Same—Special Venire—Talesman.**

Upon a trial for murder where the court ordered talesmen to be summoned after the special venire list for the term had been exhausted, there was no error. Following Mays v. State, 96 S. W. Rep., 331.

**5.—Same—Evidence—Declaration of Defendant and Third Parties.**

Upon a trial for murder, there was no error in permitting a State's witness to testify as to what he heard pass between defendant and his companion a short time preceding the difficulty, although the witness did not hear all that was said and could only state part of the conversation.

**6.—Same—Evidence—Conduct of Deceased.**

Where upon trial for murder the evidence showed that deceased was drinking and under the influence of liquor at the time of the homicide, it was immaterial what amount of whisky he had at a certain place on the night of the homicide.

**7.— Same — Evidence — Impeaching Witness — Collateral Matter — Hearsay — Charge.**

Where upon trial for murder, the State sought on cross-examination of one of defendant's witnesses to impeach him with reference to certain declarations which witness made some three days before the homicide, predicting that somebody would be killed at the place where the homicide took place; that it would be deceased, and the witness admitted the conversation over the objection of defendant that said conversation took place in defendant's absence. Held, error; that it was not impeaching matter and it was beyond the power of the court to control it in his charge, and the error was not cured thereby.

**8.—Same—Imperfect Self-Defense—Illegal Arrest—Passion—Manslaughter.**

If an officer in good faith attempts an arrest which turns out to be illegal, and he is assailed by the party whom he is attempting to arrest in such manner as to put his life in danger, or himself in danger of serious bodily injury, and he then acts and slays the party in self-defense, he would be guilty only of manslaughter, regardless of the fact whether he was excited by passion or not.

**9.—Same—Charge of Court—Self-Defense—Manslaughter—Arrest.**

Where upon trial for murder the evidence showed that the defendant, who was

an officer, approached deceased and told him to quit making a noise, and to put down his gun or he would throw him in jail, whereupon deceased threw his gun down on defendant, saying he would kill him and shot at him, and the fight began in which deceased was killed; there was no attempt at arrest, and the court's charge, to the effect that if the conduct of deceased reasonably indicated to defendant that deceased was about to kill or do him serious bodily injury and that thereupon he killed deceased, to acquit him, was adequate; and the court might have added a charge on manslaughter, on the theory that if the conduct of deceased did not reasonably cause defendant apprehension of danger, etc., and that he killed deceased while his mind was excited and incapable of cool reflection.

**10.—Same—Charge of Court—Provoking Difficulty—Converse Proposition.**

Where upon trial for murder the evidence showed that when defendant, who was an officer, first came up to where deceased and his companions were he remarked to deceased. "You have got to cut out this damn roaring"—there being a conflict of testimony as to whether the defendant used an oath and then advanced on deceased as if to take hold of his gun, and deceased told defendant not to do so, but that defendant kept advancing with his left hand under his coat on his hip, and deceased pulled his gun and began to fire, the court in charging upon provoking the difficulty, should have properly guarded defendant's rights by so framing his charge as not only to state the affirmative, but also the converse of the proposition.

Appeal from the District Court of San Saba. Tried below before the Hon. Clarence Martin.

Appeal from a conviction of murder in the second degree; penalty, thirty-five years imprisonment in the penitentiary.

The opinion states the case.

*James Flack* and *Leigh Burleson,* for appellant.—On question of charge on manslaughter: Read v. State, 11 Texas Crim. App., 509; Carter v. State, 17 S. W. Rep., 1102; King v. State, 13 Texas Crim. App., 277; Meuly v. State, 26 Texas Crim. App., 274; Partlow v. State, 4 S. W. Rep., 14.

*J. E. Yantis,* Assistant Attorney-General, and *G. A. Walters,* for the State.

HENDERSON, JUDGE.—Appellant was convicted of murder in the second degree, and his punishment assessed at confinement in the penitentiary for a term of thirty-five years; hence this appeal.

The theory of the State, which is supported by evidence, is to the effect that appellant had some grudge against deceased, and had made threats against him. On the night of the homicide the parties met at or near a club-house in the town of San Saba, and appellant and Yardley (his companion) made an attack on Pat Carroll (deceased) and in the fight which ensued, they shot and killed deceased. Appellant's theory was to the effect that he was constable of that precinct, and that the sheriff on that occasion was absent. There was a show in town that night, and he had been requested to look out and keep down any trouble or breach of the peace, and that he summoned Yardley to assist him. That after the show he and his companions went to the club-house, and after sitting there awhile they left. The club-house seems to have been shut up at this time. The owner testi-

fied that he shut it up for the purpose of dispersing the crowd, so he and some of his companinos could eat a lunch. Appellant and Yardley went off a short distance, and in a short time returned, as appellant testified, to participate in eating the lunch. After arriving there, they heard talking and cursing; and heard deceased, say to some one, "God damn you, turn my gun loose." That he then went out to where the parties were in a vacant lot, near the club-house. When he got there, Jim Meachum had hold of Pat's (deceased) gun. Appellant asked what was the matter; and they said, "nothing." Appellant said, "I want you to cut out that roaring." Brown said, he was not roaring; and Pat said, "I guess by God you are throwing that at me." Appellant said no. Pat walked around at this, and raised his gun (a winchester) and said, "Jim Meachum, you are the cause of this whole God damn business." Pat said the officers had dragged him around until he was tired, and he was not going to be dragged around any more. Appellant told him to put his gun down, or he would throw him in jail. At this deceased said, "God damn you, I will kill you," and raised his gun and fired. About the time deceased fired the second time, appellant got his pistol out and fired. Deceased's second shot powder-burned appellant. Appellant shot four or five times, and Pat turned and ran off, fell near the sidewalk, where he shortly afterwards expired.

Appellant's first assignment of error questions the action of the court with reference to overruling his motion for continuance, and his refusal of a new trial based on the previous action of the court overruling the motion for continuance, Conceding the use of diligence by appellant to secure this witness George Pace (which is doubtful) applicant says that he expected to prove by said witness that he was about two hundred yards from the club-house, near where the killing occurred. That his attention was attracted by angry talking, and that he stopped, listened, and from the language he thought the row was about over; that after waiting two or three minutes he started on up Wallace street, when he heard the gun shots, some eight or ten in number; that there was a difference in reports. The two first shots were not as loud as those that followed; that the firing lasted about half a minute. Appellant alleges that a material inquiry would be whether there was a disturbance near said club-house a short time before the difficulty. A number of witnesses were introduced, both for the State and defendant, who were much closer than is alleged as to said absent witness. None of them relate a disturbance of a loud and vociferous character, such as could be heard two hundred yards distant. Some of them speak of some disturbance occurring at or near the club-house, where deceased and his companions were. There is testimony as to some slight altercation between deceased and his companion, Meachum. The State's witnesses state this; but neither they nor appellant's witnesses show that it was loud and vociferous, such as could be heard a very great distance. There

appears to have been some loud talking before the club-house was closed up, as testified by the State's witnesses. This was uncontroverted, and it seems that appellant as well as deceased, was there when the club-house closed and all of the parties went out. State's witness says Pat had his gun with him, and Jim Meachum and Pat were quarreling; that he heard deceased, Pat say something about going hunting or having a hunt when he went home. State's witnesses as well as appellant's state that in the altercation between deceased and Meachum they heard some one say, "Turn my gun loose," and heard Woodward say, as he came up, that "he did not want any of that roaring; you have got to cut that roaring out." So we take it, that there is no material difference between the State's witnesses as to what occurred with reference to any disturbance between Pat Carroll (deceased) and Meachum at or just before the difficulty. We do not believe it was a material matter as to what the absent witness would have testified in this regard. There is no question but that there was some disturbance there, but we do not believe it was of such character as to have been heard even two hundred yards away. Besides this, the State introduced a controverting affidavit, in which the testimony of the absent witness would be impeached as to his whereabouts at the time of the difficulty by another witness. Accordingly we do not believe the absent witness would testify as stated, and if he did it would not probably be true.

We do not believe the court erred in overruling the motion for new trial based on newly discovered evidence. As to the witnesses Becker and Allen, the fact that deceased, previously on the evening of the day of the homicide, inquired if they knew where Cal Woodward was, we think, would not be material. No threat was made or suggestion of any design or purpose in inquiring for him. As to the witness M. R. Collins, it seems that he was in the courthouse at the time some of the witnesses were testifying; and the court acted in its sound discretion in not permitting him to testify.

By appellant's second bill he questions the action of the court overruling his objection to what he terms the special venire list. He says that said special veniremen drawn by the jury commissioners, were forty in number, and as shown by said list (made a part of the bill) their names begin with the letter G and end with the letter K. He alleges that it was an impossibility to have drawn such letters consecutively, beginning with G and on down through the alphabet, to and including one name beginning with K. The court in explaining the bill, says: "That the above constitutes the special venire list for the term selected at the preceding term of court by the jury commissioners, who were sworn, empaneled and instructed according to law and returned into open court under the instructions of the court." No evidence was offered as to how said drawing was made, and we cannot assume, in the absence of proof, that what may appear to be a remarkable coincidence would be an impossibility. At any rate, it

is not shown that appellant was injured by said drawing, or that any partial juror was forced on him on said account.

The next bill relates to the summoning of talesmen, after the special venire. list for the term had been exhausted. The court seems to have adopted the mode as to these talesmen authorized by law. See Mays v. State, on rehearing, 16 Texas Ct. Rep., 482; 96 S. W. Rep., 331.

By appellant's next bill he attempts to impeach the action of the court allowing State's witness, Mitch Alexander, to testify as to what he heard pass between appellant, Woodward and Yardley, a short time preceding the difficulty; that he heard Woodward say something about a gun, and Yardley say, "I will stand by you," or words to that effect; that he did not hear all that was said, only parts of the conversation. Counsel objected to this, because the witness did not hear all of the conversation, and was only able to state the part of it he heard; that this was fragmentary and was calculated to prejudice appellant. We do not believe that the action of the court was improper in this respect. Of course, a different proposition would have arisen if the court had by its ruling suppressed any part of the conversation which the witness heard and was able to relate.

We do not think it was material to prove the amount of whisky Pat Carroll had at the club-house on the night of the homicide. The testimony showed that he was drinking before, and evidently under the influence of liquor at the time of the homicide. The fact that he had much or little whisky at the club-house, it occurs to us, would be immaterial. For ought that we know, if he did not have it at the club-house there may have been plenty of whisky in town accessible to deceased. There is no proof that this was a local option town.

By appellant's sixth bill of exceptions the ruling of the court as to the admission of the testimony of Jim Meachum, who was a witness for the defendant, is questioned. On cross-examination by the State, over the objection of defendant, witness was asked: "If he did not say to John Price, on the afternoon of March 3, 1906, that there would be somebody killed over there in three days, pointing in the direction of the club-house. Price said, 'Is it Cal?' (meaning defendant). 'I said no, Big Pat' (meaning deceased)." To this testimony, both questions and answers, defendant objected because these remarks were not made in the presence of or hearing of defendant, and were prejudicial to him. The court explains the admission of this testimony, as follows: "That a predicate was laid in a manner and form as required by law as to this statement having been made to Price and the same was specially limited in the charge of the court to the sole purpose of affecting the credibility of the witness, or to show animus and not to be considered for any other purpose." The charge of the court on this subject was as follows: "You are instructed that the State was permitted to ask the witness Jas. Meachum, the question as to whether he did not at a certain time and place, state to one Price

that a man would be killed (pointing toward the club-house) over there, in less than three days, and further state to said Price that it would be Big Pat, and the witness replied that he had so told several people. This testimony was admitted for one purpose, and one purpose only, and that is as it may or may not affect the credibility of the witness, and you will consider it for no other purpose, for you cannot consider it for any purpose to establish the offense for which the defendant is now on trial."

This looks very much like Drake v. State, 29 Texas Crim. App., 265. In that case, it is true Jimmie Drake (defendant's son) denied making the statement, that on the evening before the shooting he did not say he knew his father was going to kill deceased before he left home that morning. After his denial, he was impeached as to this statement. There it was held that the matter was hearsay, and purely collateral, and the witness could not be impeached in regard thereto. Here, it does not occur that impeachment was necessary. The witness admitted that he made the statement. It was not necessary to impeach him. Said statement being made in the absence of appellant was purely hearsay. Would its tendency be to injure him? Witness is made to predict, some three days before the homicide actually occurred, it would not be appellant who would be killed at the club-house, that it would be Big Pat. Evidently this had some illusion to an anticipated collision likely to occur between these parties. One theory of the State was a conspiracy on the part of appellant and Yardley to slay deceased. This testimony would very likely impress the jury with the idea that it was generally known in the community that such a conspiracy existed; at any rate, that appellant was liable to kill deceased in less than three days. Under the circumstances of this case, we believe that said testimony was calculated to injure appellant with the jury, and should not have been admitted. See further on this subject, Cogdell v. State, 43 Texas Crim. Rep., 178; Morton v. State, 43 Texas Crim. Rep., 533. The limitation in the court's charge could not cure an error of this character. Indeed, the witness not having denied the conversation, we do not see how the court could regard it as impeaching matter. As was said in Cogdell's case, supra, "The witness cannot be impeached by immaterial matter, on a collateral issue; and when such impeachment is permitted, and the testimony is of a damaging character, it is beyond the power of the court to control it in the charge." And see Parker v. State, 10 Texas Ct. Rep., 552.

The court gave a very extended charge, embracing all of the degrees of felonious homicide; also self-defense, a charge on provoking the difficulty curtailing the right of self-defense; and a charge on appellant's rights in making an illegal arrest; and also a charge on conspiracy as between appellant and Yardley.

The court's charge on appellant's rights in making an illegal arrest is specially criticised; and it is contended that the charge was unduly

limited, in that it required appellant to be excited by passion before he could avail himself of manslaughter. We believe, malice aside, if an officer in good faith attempts an arrest, which turns out to be illegal, and he is assailed by his adversary (the party whom he is attempting to arrest) in such manner as to put his life in danger or himself in danger of serious bodily injury, and he then acts and slays the party in self-defense, he would be guilty only of manslaughter, regardless of the fact whether he was excited by passion or not. This would be the imperfect right ·of self-defense. However, it does not occur to us that there was an attempt to make any character of arrest here. None of· the State's witnesses, none of the defendant's witnesses refer to an attempted arrest in their testimony. Appellant's own evidence goes further in this direction than any other, and we have heretofore in the statement of the case quoted from that. He says, when he approached where deceased was that he told him he wanted him to cut that roaring out, evidently alluding to the noise he was making. Brown said that he was not roaring. Deceased told appellant was that flung at him. Appellant said, "no." So far there was no evidence of any intention to arrest. Deceased then said that Meachum was the cause of the whole business, and that he was tired of being dragged around by the officers. Appellant told him to put· his gun down or he would throw him in jail. At which deceased threw his gun down on appellant, stating that he would kill him, and shot at him, and the fight began. From this we fail to see any attempt at arrest. The most that can be said is that the altercation ensued because appellant (an officer) admonished the parties to desist from making a noise; and then told deceased he would throw him in jail if he did not put his gun down. If deceased was using his gun in a threatening manner, the officer might very properly have disarmed him, but he had no right to put him in jail or arrest him for carrying a winchester gun. It occurs to us that the court's charge on this subject was adequate, to wit: "If you find that defendant went to where deceased, Pat Carroll was, for the purpose of preventing or suppressing a disturbance of the peace, and the deceased, without any unlawful act first being done toward him by defendant, did any act which either alone or coupled with his words or conduct, reasonably indicated to the defendant, judged from his standpoint at the time, that deceased was about to kill or to do him serious bodily injury, and he thereupon shot and killed deceased, such killing would be in self-defense, and if you so find, the facts to be, you will acquit the defendant." To this the court might have added the following proposition: If the jury believed appellant went to where deceased was as above suggested, and deceased did some act in the ·first instance of a hostile or menacing character, but which did not reasonably cause defendant to apprehend danger to his person or his life, but that on account of such acts, appellant's mind became excited and he

was rendered incapable of cool reflection, and on such account, slew deceased, he would be guilty of no more than manslaughter.

On the question of provocation, which is always a limitation on the right of self-defense, the court is never authorized to give such an instruction unless the facts of the case justify it. One witness stated that when appellant first came up to where deceased and his companions were, appellant made the remark, "You have got to cut out this God damn roaring." Another witness said, that he told him he had to cut out that roaring, and advanced towards deceased as if to take hold of his gun. Deceased said, "You don't want to take hold of this gun." Woodward kept advancing, with his left hand under his coat on his hip, and deceased pulled his gun and began to fire. Now, unless this language of appellant to deceased can be construed into a provocation, there was no provocation. It may be, in the light of the surrounding facts, especially the threats shown to have been made by appellant towards deceased, and some of his language used that night, the court may have been authorized to have given a charge on provoking the difficulty. But the charge should have been framed in such manner as to have carefully safeguarded appellant's rights; that is, on this character of testimony, should have instructed the jury, if appellant approached on that occasion to where deceased was and used toward him any language or did any act in connection therewith, calculated to provoke a difficulty, and for the purpose and with the intent of provoking it, which caused deceased to attack him, then he would not have the right of self-defense. On the other hand, although the jury might believe appellant approached where deceased was, and used the language attributed to him by some of the witnesses, but did it merely to quiet the disturbance and with no intent to provoke a difficulty, and deceased first attacked him, then he had the perfect right of self-defense.

We do not deem it necessary to discuss the question of conspiracy. There may be enough in the testimony to suggest that there may have been some agreement or conspiracy between appellant and Yardley to kill deceased on that night. Our attention has not been called to any particular defects claimed to exist in the court's charge on this question, and consequently we will not discuss this charge.

For the errors discussed, the judgment is reversed and the cause remanded.

*Reversed and remanded.*