### ROY BURNAM v. THE STATE.

No. 841. Decided January 25, 1911.

**1.—Murder—Evidence—Condition of Defendant's Mind—Threat.**

Where, upon trial of murder, which grew out of the bad feeling existing between the deceased and the defendant who were related by marriage, and which resulted in threats by the deceased against the life of the defendant, and which besides self-defense raised the issue of manslaughter, it was reversible error to exclude testimony to show that the wife of the defendant had communicated to him that she thought if they remained on her father's place any longer there would be trouble between him and defendant; this was admissible to show the state of defendant's mind at the time of the homicide, and was in the nature of a threat by deceased.

**2.—Same—Evidence—Threats—Impeaching Witness—Opinion of Witness.**

Where, upon trial of murder, defendant's witness testified to the threats of the deceased in which the latter said that he intended to kill the defendant,

it was reversible error to permit the State's counsel on cross-examination to elicit the opinion of the witness that he had said after the homicide that he believed that defendant had determined to kill the deceased. The witness could not be impeached in this manner.

### 3.—Same—Charge of Court—Threats—Self-Defense—Words and Phrases.

Upon trial of murder, where the evidence showed threats by the deceased against the life of the defendant, it was reversible error to charge the jury that if they believed that the deceased at the time of the killing made "some hostile overt act," instead of using the language of the statute, to wit: "some act then done manifesting an intention to execute the threat."

Appeal from the District Court of Wise.    Tried below before the Honorable J. W. Patterson.

Appeal from a conviction of murder in the second degree; penalty, twenty years imprisonment in the penitentiary.

The essential facts immediately concerning and surrounding the killing show, substantially, on the part of the State, that the homicide took place at night in the village school house where the people of the neighborhood had assembled for religious worship; that the deceased had seated himself with others on one of the front benches in the school house, facing the pulpit or rostrum; that defendant's wife was also among those present; that shortly thereafter the defendant and his companion entered the school house, and walking behind the deceased defendant shot him, first in the back of the head, and then fired two more shots which took effect in the deceased's forehead and chin as he sank back on the bench; that deceased was doing nothing at the time when defendant approached and shot him, but that a pistol was taken from his pants pocket after the shooting.

Defendant took the witness stand, and after testifying to the various altercations between himself and deceased, and which led to the separation of defendant and his wife, stated that he had left the place of deceased, where he had a growing crop, and had gone to his father some twenty or thirty miles away to avoid a difficulty with the deceased; but that on account of his crop needing his attention he had temporarily returned to the neighborhood, but not to his father-in-law's place, and at the time of the homicide lived with his uncle; that while there the latter, a day or two before the killing, informed him of the threats of the deceased against defendant's life, and that defendant was also informed through others that if he stayed there deceased had threatened to kill him; that from these threats, and the seemingly hostile demeanor of deceased during a casual meeting of defendant and deceased at church a few nights previous to the killing, he carried a pistol for his protection; that he went to the school house on the night of the killing, however, not expecting to meet deceased, but to attend the religious services; that when he entered the school house he saw his wife there, and also noticed deceased sitting on the bench, and that when defendant incidentally came near deceased the latter appeared to make a hostile demonstration by dropping his right hand to his side and feeling for something under his clothing, whereupon defendant

immediately drew his pistol and fired at deceased; that he was very much excited at the time by reason of deceased's action and previous threats, and defendant believed he was acting in self-defense.

Several of defendant's witnesses testified to the threats by the deceased, and that they had communicated the same shortly before the homicide to the defendant, etc.

*R. E. Carswell* and *Robt. Carswell,* for appellant.—Upon question of rejecting testimony with reference to the wife of defendant wanting defendant to leave her father's house, as affecting the issue of manslaughter: Cordono v. State, 56 Texas Crim. Rep., 447, 120 S. W., Rep., 471; Freeman v. State, 46 Texas Crim. Rep., 318, 81 S. W. Rep., 953.

Upon question of admitting testimony to impeach defendant's witness by showing his opinion as to what he thought defendant would do, Watson v. State, 50 Texas Crim. Rep., 171, 95 S. W. Rep., 115; Woodward v. State, 50 Texas Crim. Rep., 294, 94 S. W. Rep., 499; Drake v. State, 29 Texas Crim. App., 265.

*C. E. Lane,* Assistant Attorney-General, and *McMurray & Gettys,* for the State.

HARPER, JUDGE.—The appellant was indicted for the murder of John Mosier. His trial resulted in a conviction of murder in the second degree with a penalty of twenty years confinement in the penitentiary. The case was submitted to the jury by the court below on murder in the first and second degrees as well as manslaughter and self-defense. A number of questions are presented but on account of the disposition that shall be made of this case it becomes unnecessary to decide many of them, as they are not likely to occur upon another trial.

In the trial of the case the testimony developed that John Mosier, the deceased, was the father-in-law of defendant; that there had been a separation of defendant and his wife, the contention of defendant being that his father-in-law had brought about this separation and that he, defendant, was entirely blameless. The testimony on the part of defendant as proved by several witnesses shows that Mosier had made threats against the life of the defendant. One witness, Dr. Rogers, testified that the deceased sent for him at one time and asked him to prescribe for his daughter; that the deceased said he believed she was pregnant and asked witness for medicine to produce an abortion; that Mosier stated that he had rather his daughter would "bring a child from the coalest black nigger in the State than to bring a child from Roy Burnam," and that she was not going to do it if he could help it, calling defendant a dam son-of-a-bitch. A great deal of testimony was offered pro and con along these lines showing that deceased was bitter toward the defendant; that he did not want his

daughter to have a child by the defendant. When defendant was upon the witness stand he testified that he and his wife lived with deceased at his home but that matters grew so bad that they concluded to seek another home; that the deceased was the cause of the separation between him and his wife and that his wife was in no way desirous of separating from the defendant, and he desired to prove the conversation between himself and wife after they had left the defendant's house in which conversation, defendant proposed to swear, that while going up to McMillan's he stated to his wife that he believed it would be a good idea for the defendant to take his wife and get out of the country, and asked his wife if she did not think there would be trouble, and she assented that she believed there would, and said that she thought it best for them to get out of the country, and if they did not they were going to have trouble; that his wife agreed to go with him. This testimony was objected to on the part of the State as being irrelevant and a conversation between defendant and his wife. This conversation was in the nature of a threat, and we think on the question of manslaughter, if for no other reason, this testimony was clearly admissible as showing the state of the defendant's mind; to show that the wife had communicated to him that she thought if they remained there longer there would be trouble between her father and him. It was a circumstance that the jury should have received to determine the condition and surrounding of the parties before the killing, and to show that he had been advised by his wife that there would be trouble if they remained, as well as at that time. A bill of exception was reserved to the action of the court in refusing to allow the defendant to so testify. In this we think there was error on the part of the court.

Bill of exception No. 4 is to the action of the court in permitting Word Paine, over the objection of defendant, to testify that he had a conversation with one Jim Burnam the day after the killing of Mosier in Chico, and had a talk with him at Barnhill's livery stable, and in that conversation Jim Burnam told the witness in speaking of the defendant and Mosier: "I begged, persuaded and done everything I could to keep that boy from killing him, but he was determined to kill him." This was but an expression of opinion. The court permitted this testimony to go to the jury for the purpose, as stated in bill of exceptions, of impeaching the witness Jim Burnam. The witness Jim Burnam had previously testified in the case at some length, in which he stated several conversations that he had with the deceased in which the deceased said he intended to kill defendant; that on one occasion he took his gun and went and took a stand by the road and would have killed the defendant had not defendant's wife been with him. Any threat or statement of appellant would have been admissible. On cross-examination by the State he was asked if he had not told Word Payne that appellant was determined to kill deceased. He denied it. We are of opinion that the court was in error in permitting this testimony to go to the jury; that the same was damaging and hurtful:

that this was but an expression and conclusion of the opinion of this witness Jim Burnam, and that the defendant could not be bound thereby; that it was a collateral matter, and as original testimony in the case, could not have been introduced primarily by the State; that when the witness Burnam answered the question it was the end of the controversy, and that the witness could not be impeached upon a wholly irrelevant and immaterial matter. Testimony similar to this has been passed upon frequently by this court, and it has always been held that such testimony is not admissible and it could not even serve the purpose of impeachment. It would be injecting into the case a matter highly prejudicial to the rights of the defendant; it makes the witness give a conclusion about a matter and his judgment on his conclusion, and is but substituting the issue to be tried by the jury to the witness and making the opinion and judgment of the witness a controlling issue and passing upon the very fact that belongs exclusively to the province of the jury. Statements or threats of appellant would be admissible, but not conclusions drawn from such statements by a witness. See Drake v. State, 29 Texas Crim. App., 265; Watson v. State, 95 S. W. Rep., 115; Woodward v. State, 50 Texas Crim. Rep., 294, 97 S. W. Rep., 499.

As the case will have to be reversed, we would call the attention of the trial court to an error we think in the charge on the subject of threats. While this is not complained of in the motion for new trial, yet a special charge was requested by the defendant and refused by the court, which we think was a correct statement of the law upon the subject of threats and should have been given. The main charge directed the jury that if they believed that the deceased at the time of the killing made some hostile overt act showing intention to carry such threat or threats into execution the defendant would be justified. This character of charge has been condemned by this court frequently, and should not be given. It throws upon the defendant a greater burden than the law itself, the language of the statute being some act then done manifesting an intention to execute the threat. But here the court says some hostile overt act. This, we think, is putting the matter too strong, and the special charge requested by the defendant should have been given.

For the errors indicated the judgment is reversed and the cause remanded.

*Reversed and remanded.*