### E. L. Jones v. The State.

No. 6091. Decided June 22, 1921.

**1.—Murder—Threats—Charge of Court.**

Where, upon trial of murder, the court in his charge on threats placed a greater burden than the law itself required upon the defendant, the same was erroneous and should be corrected. Following Burnam v. State, 51 Texas Crim. Rep., 51.

**2.—Same—Evidence—Insult to Female Relative—Part of Transaction.**

Where upon trial of murder, defendant offered certain testimony with reference to an insult by deceased to defendant's wife, to which the State objected but the qualification to the bill of exceptions showed that the witness was permitted to fully answer the question originally propounded, there was no reversible error; besides, there was no evidence in the record that the killing was brought about by this matter, and did not come within the rule of Art. 811, C. C. P.

**3.—Same—Evidence—Opinion of Witness—Undisclosed Motive of Deceased.**

Where, upon trial of murder, the wife of deceased testified that while she could not see her husband when he was using certain threatening language, she knew his voice and that he was addressing this language towards his dog, who was interfering with his livestock, and that she knew at the time that the threat to kill was towards his dog; but the defendant and his son testified to substantially the same language when they saw deceased, but that this language was addressed to defendant, who shot the deceased

89 Tex.—37

after deceased had fired on him; held, that it was reversible error to admit in evidence this declaration of the wife of deceased, as it was simply an opinion of the witness concerning the undisclosed motive of the deceased. Following Drake v. State, 29 Texas Crim. App., 265.

Appeal from the District Court of Liberty. Tried below before the Honorable J. L. Manry.

Appeal from a conviction of murder; penalty, eight years imprisonment in the penitentiary.

The opinion states the case.

*Stevens & Stevens,* for appellant.—On question of undisclosed motive of deceased: Conde v. State, 24 S. W. Rep., 415; Holloway v. State, 113 id., 928, and cases cited in opinion.

*R. H. Hamilton,* Assistant Attorney General, for the State.—On court's charge on threats: Perry v. State, 155 S. W. Rep., 263.

HAWKINS, JUDGE.—Conviction was for murder, the punishment being assessed at eight years' confinement in the penitentiary.

The facts as developed upon the trial, in so far as it is necessary to discuss the assignments of error, will be set out later in the opinion.

The following charge was requested, and refused, to which error is assigned: "If it reasonably appears to the defendant from all the circumstances of this case, viewed from the defendant's standpoint at the time, that the deceased was about to shoot him with a gun, he was justified in killing deceased, although in fact you may believe from the evidence that defendant was in no danger of being shot by deceased." As we understand the record, there was no occasion for the court to give this charge. Apparent danger was not an issue. When accused claims to have acted upon the appearance of danger, then it is necessary for the court to instruct the jury that in determining whether he did so act, the situation must be viewed from his standpoint at the time. If danger threatened the appellant it was not apparent danger, but actual. In this connection, he was supported by his son, who was present at the homicide. If such a charge had been called for by the evidence it is practically covered by the court's charge on threats, which he combined with a charge on "threatened attack," and told the jury the matter must be viewed from appellant's standpoint.

No complaint is made of the charge upon threats, and, therefore, we cannot review the same; but in view of another trial we would suggest that it occurs to us the learned trial judge fell into error similar to the one pointed out in Burnam v. State, 61 Texas Crim. Rep., 51, 133 S. W. Rep., 1045. In that case the jury were told if they "believed that the deceased at the time of the killing made some *'hostile overt'* act showing intention to carry such threat or threats into execution, the defendant would be justified." It was held in that case that the foregoing charge was erroneous, and threw upon the defendant a greater

burden than the law itself required. In the instant case, after using the language of the statute, the court qualified or explained that it means some "act or word which reasonably indicated to defendant that the *'threatened attack'* had then commenced to be then executed." The use of the words "threatened attack" practically means the same as "some hostile overt act."

While appellant was testifying he was asked upon cross-examination about some previous difficulty between his father, J. S. Jones, and the deceased, Jim Burress, in which it appeared that J. S. Jones slapped deceased, and appellant stood near with a gun in his hand.

On redirect examination he was asked what that difficulty was about, and replied that it "came up over some remark that Mr. Burress made while he was abusing him (his father) about my mother." He was then asked: "State whether or not this man Burress had slandered your wife?" Objection was made, and the court inquired the purpose of the inquiry; upon being advised that it was to show that Burress had insulted appellant's wife which led up to the first difficulty with his father and Burress, the court sustained the objection; exception was reserved. The court qualifies this bill by showing that later appellant was permitted to testify that he had filed a complaint against deceased for using slanderous language about his wife; that Mr. Eli Wheeler was the main witness in the case; that he had died, and for that reason the case had been dismissed. The qualification leaves no merit in the bill, for the witness was permitted to fully answer the question originally propounded.

In this connection appellant offered the complaint in evidence, which was excluded. It showed a charge against deceased, for slanderous statements made in regard to appellant's wife in the presence of one Wheeler. This complaint was filed in the Justice Court in June, 1913, six years before the killing occurred. There is not the slightest intimation in the record that the killing was brought about by the previously alleged slanderous statements of deceased. But appellant insists that the State having brought out the fact that the appellant, during a previous difficulty between the deceased and appellant's father, stood by with a gun in his hand at a time when appellant's father slapped deceased, and that there had been ill-feeling between deceased and appellant, that, therefore, appellant, under a proper construction of Article 811, C. C. P. had the right to go into the matter and show all of the antecedent facts, including the offered complaint.

The State had inquired of appellant about the trouble between deceased and appellant's father, and appellant's connection with it. When asked by his own counsel as to the cause of the difficulty, he said it was because of some remark deceased had made about his mother while abusing his father. This was his own explanation of how the trouble arose. After this he was asked if deceased had not slandered his, appellant's wife. Apparently there is no connection between the two transactions. Three bills of exceptions appear in the record, with

reference to this same matter, and after an examination of all three we fail to discover anything showing a connection between the alleged slander of appellant's wife, and the trouble between deceased and appellant's father. The bills do show that when the trial judge inquired the purpose of the proposed testimony counsel for appellant stated that "it was to show that deceased had dogged appellant, and insulted his wife, which led up to the first difficulty between the father of appellant and deceased." This is not certified in any three of the bills as a fact, but appears only as the grounds upon which the testimony was offered. The complaint offered was filed six years before the killing. The bills are silent as to when the trouble between deceased and appellant's father occurred. It may have been contemporaneous with the trouble, and partly the cause of it, but there is nothing in the record to show it. On the other hand, it may have been prior or subsequent thereto, and having no connection therewith. The complaint offered was the *ex parte* affidavit of appellant, charging slander against deceased, which proved no more than he had already testified, and we conclude, under the circumstances, it does not come within the rule of Article 811, C. C. P., because not shown to have been coincident with, or explanatory of, the act inquired about by the State. After appellant testified that he had filed such complaint the fact was not controverted by the State in any way. We hold no error was committed in excluding the complaint.

In order to discuss an assignment of error which presents a serious question for the consideration of this court, we will state in as condensed form as possible a portion of the testimony disclosed by the record.

The deceased, J. M. Burress, and appellant lived in the same community, in what is denominated in the record as the "Big Thicket." Ill-feeling had existed between them for a number of years, and evidence of threats by deceased against appellant appear in the record.

On the day of the homicide the deceased was going to a point on the river some two or three miles distant from his home with his wagon to get some lumber out of an old house, and took with him his wife and other members of the family, leaving them at a certain point to pick berries until his return. It was understood that when he came back with the lumber he would leave his wagon at an old road and assist them in picking the berries. It appears that deceased owned a dog which was very bad about killing hogs whenever an occasion presented itself, and the testimony of deceased's wife and other members of the family shows that this dog was after some hogs near where they were picking berries, and they tried, without success, to get him away from them. It would seem from the description of the particular locality that the growth and underbrush was very dense, and it was impossible to see any distance. While Mrs. Burress and the children were attempting to get the dog off of the hogs they heard deceased come up on the opposite side of the particular thicket in

which the dog was worrying the hogs, and recognized him from his voice, but did not at any time see him.　Mrs. Burress, in this connection, testified that when she heard her husband he was talking to the dog, and heard him say: "That won't do you a God-dam bit of good," and something more in connection with it, which she did not understand.　She then testified, "I knew it was him, and knew he was going to shoot the dog."　Appellant immediately excepted to that portion of her statement in which she said she knew he was going to shoot the dog, as being a conclusion and opinion of the witness, and requested the court to withdraw same from the consideration of the jury, which the court declined to do, and bill of exceptions was reserved.　The married daughter of deceased, who was with them upon the occasion in question, testified that she heard her father calling the dog to come back, but did not hear the expression testified to by her mother..　Dee Burress, the eleven year old son of the deceased, testified that he heard his father after the dog, and heard him say, "Come back here, you ring-necked son-of-a-bitch, I am going to kill you," and that almost immediately the gun fired.

The record further discloses that appellant, E. L. Jones, had received a citation requiring him to be at Houston in court upon a certain date, and that upon the morning in question he was preparing to answer this summons, and had sent his son, Dawson Jones, out into the thicket to hunt his horse while he remained at the house making preparations for the journey.　Upon the horse hunt the boy carried a single barrel shot gun with him; failing to find the horse, he returned to the house and so reported to appellant.　Appellant then went with the boy to assist in searching for the horse, and they carried with them this same gun that the boy had on the first trip.　On cross-examination of the witness, Dawson Jones, the district attorney inquired if, while he was in the thicket hunting the horse, he did not learn of the fact that deceased was also there, and reported it to his father.　This was denied by the witness and there is no proof in the record that appellant or his son knew that deceased was anywhere in the immediate neighborhood.　While appellant and his son were hunting the horse they approached the same thicket, or locality, where deceased's dog was after the hogs.　Appellant's son, Dawson Jones, testified that, about the time he was going to put the rope on the horse, which they had found, he saw Mr. Burress some distance away and thought his father had also seen him; that after catching the horse they started towards an old road that run through the thicket, and that he heard Mr. Burress say: "Come on, you God-damn hog-hearted son-of-a-bitch, I am going to pop a Winchester ball through you;" that at this time he looked and could only see Mr. Burress from his waist down, but recognized his voice; that he and his father started to go around where Burress was, when the latter said: "You needn't go through there, it won't do you a damn bit of good;" that he and his father walked a few steps further when deceased said: "Hold

up there, you God-damn hog-hearted son-of-a-bitch, I am going to kill you." Appellant, in this connection, testified that the first he knew of the presence of deceased was when he used the following language: "Just come out, you God-damn son-of-a-bitch, I aim to put a Winchester ball through you;" that he recognized deceased by his voice, but could only see him, at that time, from his waist down; that he and his son turned to go around deceased when deceased said: "It won't do you any good to go out through there, you God-damn son-of-a-bitch, I am going to throw a Winchester ball right square through you;" that he went on a few steps into an old road, and that deceased jumped into the road not very far from him and said: "Hold up there, you God-damn son-of-a-bitch, I am going to kill you." Appellant and his son both testified that after the use of the language testified to by them, deceased fired at appellant with a Winchester rifle with which he was armed, whereupon he was shot by appellant and killed.

Appellant fired two shots from the single-barrel shotgun, which shots were heard by Mrs. Burress and the children, but they claim never to have seen the appellant and his son at any time, and appellant and his son claim never to have known that Mrs. Burress and the children were anywhere in the neighborhood. The statement by appellant and his son that deceased fired at appellant with the rifle was controverted by the State, and that was one of the issues in the case.

With this condition of the record we now come to discuss the question as to whether the admission of the statement by Mrs. Burress that "she knew her husband was going to shoot the dog" was such an error as will make it necessary to reverse the judgment.

That the admission of the statement, and refusal to withdraw it from the jury was erroneous, cannot be questioned. At the time Mrs. Burress heard her husband talking, as she evidently thought, to the dog, she could neither see him, the dog or hog. She could not know what his intentions were. She could draw her conclusions from the facts occurring at the time, but her conclusions were not statements of facts. She could tell the jury what the facts were, and it was their province to draw their own conclusions. Perhaps the leading case in this State upon the question is Drake v. State, 29 Texas Crim. App., 265. Drake was being tried for killing Guinn. Drake's son testified to facts favorable to his father. Upon cross-examination the State asked him if he had not on the day after the killing stated to certain witnesses, "that he knew his father was going to kill Guinn before he, witness, left home on the morning of the homicide." Witness denied making the statement, and the State was permitted to impeach him on this question. Objection was made that it was an opinion and conclusion of the witness, and therefore, a predicate could not be properly laid to impeach on such conclusion. On motion for rehearing, Judge Wilson, writing for the court, said:

"Knowledge of another's intent or purpose can only be an inference or conclusion from facts; it is not itself a fact. Knowledge of another's intent or purpose may be established by proof of facts showing such intent or purpose, and showing that such facts were known to the person to whom the knowledge is to be imputed. When such proof is made knowledge of the intent and purpose of the other is an established fact, but without such proof a statement of the intent and purpose of another can not be regarded as anything more than an opinion, a belief, a conclusion of the party making such statement."

However, it is not in every instance that admission of improper testimony will operate to reverse a case. But where an issue is sharply drawn, and the incompetent evidence is upon that issue, and calculated to affect the minds of the jury adversely to accused, and probability of injury appears, then it becomes the duty of this court to reverse. What is the condition here? There can be no doubt that deceased used language substantially as attributed to him by both the State's and appellant's witnesses. So far as the record shows, Mrs. Burress and the children were unaware of the presence of appellant and his son, and they had no knowledge of the proximity of any member of the Burress family, save deceased, and yet, every witness who undertakes to repeat deceased's language makes it substantially the same. Doubtless the pivotal issue for the jury to determine was whether deceased was addressing his remarks to the dog or to appellant. With the case in that shape, Mrs. Burress is permitted to say to the jury, "I knew he was going to shoot the dog." Doubtless she thought so, and may have been correct in her conclusion; but what did appellant think about it? What did he have a right to think from what he saw and heard? In Berry v. State, 37 Texas Crim. Rep., 44, 38 S. W. Rep., 812, defendant was being tried for theft of a heifer from Robertson. The heifer was found in Berry's possession some time after it was missed. Robertson took her home, and testified she smelled her mother, "and by this fact he knew she recognized said cow as her mother." This conclusion was held inadmissible, and the judgment reversed. See, also, McDougal v. State, 81 Texas Crim Rep., 179.

The admission of the testimony complained of was erroneous. It was upon one of the vital issues in the case, and was calculated to injuriously affect appellant's interest. The jury may have argued if Mrs. Burress, from all the circumstances, knew her husband was talking to and threatening to kill the dog, that appellant ought to have known this same thing.

If the point arose on a collateral matter we might content ourselves with holding the error harmless; but it is upon what seems to us the main, or one of the main, issues in the case, and it is too close and serious a question for this court to speculate about. We are unwilling to say the error did not work to the detriment of accused.

While we do not discuss the other bills of exceptions, we have examined and considered them, and think no errors are presented.

For the error indicated the judgment must be reversed, and the case remanded.

*Reversed and remanded.*