## JOHN SMITH v. THE STATE.

### No. 1612.    Decided April 10, 1912.

### Rehearing Denied May 8, 1912.

**1.—Murder—Charge of Court—Manslaughter—Provocation.**

Where, upon trial of murder, there was evidence tending to show that the provocation did not come from the deceased but from others, and the court submitted this phase of the case in a proper charge, there was no error in the court's charge on manslaughter in limiting the provocation producing the passion to the acts of the deceased; the evidence warranting such a charge also.

**2.—Same—Charge of Court—Threats.**

Where, upon trial of murder, the defense claimed that other parties than the deceased had made threats against the defendant and had attempted to execute same when defendant mistook deceased for said third party and killed him, but the court properly submitted this theory to the jury, there was no error; besides, the objection thereto was too general.

**3.—Same—Charge of Court—Precedent.**

Where, upon appeal from a conviction of murder in the second degree, the appellant objected to the court's charge on manslaughter, self-defense and other parts of the charge in a general way, the same could not be considered; besides, all these charges were considered and passed upon in a previous appeal and found correct.

**4.—Same—Article 723, Code Criminal Procedure.**

While defendant under the statute can for the first time make objections to the charge of the court in a motion for new trial, yet under Article 723, Code Criminal Procedure, unless the alleged error is calculated to injure the rights of the defendant, this would not be ground for reversal, and such objections can not be looked upon as of the same gravity as if they had been called to the attention of the court by special requested charges.

**5.—Same—Charge of Court—Limiting Testimony.**

It is not required that testimony should be limited, where it can only be used for the purpose for which it was introduced, and where defendant himself introduced testimony that he had a difficulty with a third party and asked no charge limiting this testimony, there was no error.

Appeal from the Criminal District Court of Dallas.    Tried below before the Hon. Robt. B. Seay.

Appeal from a conviction of murder in the second degree; penalty, thirty years imprisonment in the penitentiary.

The opinion states the case.

*A. S. Baskett,* for appellant.

*C. E. Lane,* Assistant Attorney-General, for the State.

PRENDERGAST, JUDGE.—The appellant was indicted for the murder of Will Overstreet, alleged to have occurred May 26, 1908. He was convicted of murder in the second degree and his penalty fixed at thirty years in the penitentiary.

This is the second appeal in this case. The first is reported in 57 Texas Crim. Rep., 585. It is unnecessary to make an extended statement of the evidence. The evidence on this trial was in some particulars different from the trial reported before. The case can be understood, however, from that report of it. On that trial the court charged fully on murder in the first degree. As he was then found guilty of murder in the second degree he could not again be tried for murder in the first degree; hence, the court in this case only gave so much of the charge on murder in the first degree as to make clear the charge on murder in the second degree. As shown by the decision before, the case was then reversed because of a fatally defective charge on murder in the second degree. On this trial, the court gave a full and correct charge on murder in the second degree and there is no complaint thereof on this appeal.

In other respects the charge in this case is substantially the same as it was on the other appeal. There were then attacks of the charges on the other subjects but this court in the other opinion said: "There are many isues of the case and the charge of the court covers a great many questions. This charge we have carefully examined and, except in the respect quoted above, find no error in same." The same issues on the former trial were in this trial and the charge of the court on all these issues is substantially the same as the charge on the previous trial, except the defective charge for which the case was reversed, was cured on this trial and no objection made thereto.

Some of the objections now made were not made to the other charge.

In charging on manslaughter the court quoted articles 1128, 1129 and 1130, Penal Code; then 1137, except in stating wherein that article says, "referred to in the third subdivision of article 1129" stated said third subdivision of article 1129. Then followed a correct charge that they must consider in connection with the provocation all the facts and circumstances in evidence and if by reason thereof appellant's mind at the time of the killing was incapable of cool reflection and said facts and circumstances were sufficient to produce such state of mind in a person of ordinary temper, then the proof as to the sufficiency of the provocation satisfies the requirements of the law. Appellant objects to that part of this charge wherein is quoted subdivision 2 of said article 1129 on the ground that the defense was that the

provocation was given by another person than the party killed and claims that this charge positively tells the jury that such is not sufficient to reduce the killing to manslaughter. The evidence on this point, briefly stated, is: Appellant and one of his witnesses testified that some week or ten days before this killing, appellant was at a certain saloon in Dallas when a dark complected woman (evidently a prostitute) approached him and requested him to treat her. He declined. She thereupon cursed him and used an offensive epithet and he slapped her. The saloonkeeper, his other witness, testified that this woman was not a Mexican. Appellant thought she was. He then claimed that on the evening before the killing that night he saw this woman about some shanties where Mexicans, negroes and others lived, opposite across the street from the boarding house where he that day went to board and where he killed the deceased that night and that during the night, soon after dark, he heard Mexican men and women in the street in front of these shanties threaten to kill him and he feared an attack by them; that he met the deceased at this boarding house that night and asked him for a gun and deceased told him he had none but he had a friend who had one and from whom he could get it; that he and deceased thereupon at night left the boarding house, the back way, went to the friend of the deceased and borrowed a single-barrel shotgun telling the saloonkeeper from whom it was borrowed that they were going hunting the next day; after remaining in the saloon talking for some time, deceased and appellant then went back to the boarding house, deceased going around in front of the house and appellant, with the gun, going in the back way. The landlord met appellant in the house with the gun, asked him about it and he claimed that it belonged to him and that he had merely brought it from where he had previously boarded; that later he went out in front of the boarding house on the gallery steps with the gun and again heard the Mexicans making threats against him. Some time before this Mrs. Carter, the daughter of the landlord, and a man friend, and another friend and his wife went a few blocks away from the boarding house to a very sick relative's. After staying there some time these four persons returned to the boarding house all along together. On account of the overflow in the city of Dallas at that time no city lights were burning, the city was in darkness and the night was dark. There was a light burning in the hall of the boarding house. In returning from the sick relatives, Mrs. Carter and the three friends with her returned on a street passing the Mexican shanties and when they reached about the corner of the street where the shanties were located, they all laughing and talking, Mrs. Carter told them she could beat them to the boarding house. The four persons thereupon began running, still laughing and talking, diagonally across the street from the corner where the Mexican shanties were, to the boarding house. In the race Mrs. Carter was just a few feet ahead of her man friend and the other man and his wife just behind them. That the appellant was

then standing in the door leading from the gallery of the boarding house into the hall where the light was. Mrs. Carter could see and identify him and did do so in her testimony, but paid no attention to him. Just as she stepped on the gallery a few feet from appellant, he threw down his gun on her, said, "Stop or I will kill you," and immediately fired, shooting her in the arm. She screamed and began falling backwards when the man friend caught her and they immediately began running back, whence they came. As the man friend caught her appellant said, "Drop her or I will kill you" (appellant denied saying this), he claiming that he thought these persons were the Mexicans attacking him. Mrs. Carter and these persons who were with her testified that there were no Mexicans out in front of the house, or anywhere in the street between there and the boarding house at the time they passed along there and at the time appellant shot her. As soon as appellant shot Mrs. Carter in the arm and she screamed and her companions ran away with her, appellant walked back through this lighted hall into a back room, or cutoff end of this hall where there was another light and thereupon proceeded to extract the shell from his gun and reload it. The firing of the gun and the screaming of Mrs. Carter and the commotion awakened some of the inmates of the house. One of them was Mr. Davenport, who was asleep in a room adjoining the room or cutoff hall where appellant then was and had just reloaded his gun, and another was the proprietor who slept in a room still further back opening into this hall or room where appellant then was. Davenport arose, started into the room where appellant was and told him he ought not to be shooting there in the house that way. Whereupon, appellant pointed the gun towards him and said, "Stop, don't you come here or I will shoot you." Davenport then went back into his room. In three or four minutes after the first shot a police officer arrived on the scene and met on the gallery at the entrance of the boarding house the deceased. Deceased had been in a room opening into this main hall and next to the front gallery asleep. The shooting of Mrs. Carter and her screams and the commotion caused thereby awoke him and he got up and went out on the gallery where he met the police officer. Deceased did not know who had done the shooting and stated to the officer at the time that the shooting did not occur there but must have occurred at some other house. When told by the police officer that the shooting had occurred there and the man who did it had gone back into the house, they thereupon went back together into and through the lighted hall to this room or cutoff part of the hall, where the appellant was with his reloaded gun. As they approached the door, the appellant claims and testified, that he thought it was the Mexicans who were after him for the purpose of doing him violence. Appellant said, "Don't open that door." The police officer then said to deceased, "Open that door, Will" (meaning deceased). Deceased immediately took hold of the knob of the door and pulled it open quick and just as he did, appellant shot and killed

deceased. Immediately after he shot deceased, he stepped into an adjoining room, Davenport's room, reloaded his gun and came back to the door deceased had just opened and pointed his gun to the police officer who stood there in the light with his pistol in his hand and commanded appellant to drop his gun or he would kill him. Appellant then lowered his gun and just at this point the proprietor approached him, took hold of the stock of the gun, told him not to shoot and began taking the gun from him. Appellant said to the proprietor, "Look out, this gun is cocked or loaded," the witness did not remember for certain whether he said "cocked" or "loaded." The gun was then discharged into the floor. Appellant was arrested and carried away.

In our opinion this testimony and especially what occurred after deceased appeared on the scene and appellant went back to the door of the room or cutoff hall where the deceased was, with his reloaded gun and deceased having opened the door, as he did, after appellant had told him, as all the witnesses say, "Don't open that door" that there was no error in the court quoting the subdivision of article 1129 Penal Code, complained of by appellant.

In addition to this the subsequent portion of the charge on manslaughter particularly and specially covered every feature of the provocation given on this occasion on the assumption that the appellant thought, or believed that the deceased alone, or the deceased in connection with the police officer, was a Mexican, or Mexicans seeking to find and attack him. The charge on this subject is quite lengthy and it is unnecessary to quote it. We think it covered, in every way that the appellant could claim, his theory of the provocation being given by another person or persons other than the deceased and he could not have been injured thereby.

Other criticisms by appellant of the charge of the court are that the charge on threats ignored and destroyed appellant's defense of mistake of fact and required the jury to believe that the deceased at the time of the killing was doing some act that manifested an intention on his part to execute the threats; again, that the charge on communicated threats is in a negative form and not in an affirmative; again, that the charge on manslaughter and self-defense wherein it attempted to group the facts that would mitigate or excuse the act, does not group all the facts in evidence that were calculated to bear upon the minds of the jury in that it nowhere groups or permits the jury to take into consideration the acts and conduct and hostile demonstrations of the Mexicans as testified to but restricts the same to threats. Again, that in the charge on manslaughter and self-defense in each instance, it requires the defendant to prove, or the jury to believe, the facts and circumstances that would either mitigate or excuse the act with the same degree of certainty that it requires the proof of, or the jury to believe, the proof showing the corpus delicti and that said charges impose an undue burden on appellant to establish his defenses and mitigating circumstances.

In our opinion these complaints of the charge are too general to require our consideration. Ryan v. State, 64 Texas Crim. Rep., 628, 142 S. W. Rep., 878 and Berg v. State, 64 Texas Crim. Rep., 612, 142 S. W. Rep., 884. However, we have considered all of these matters in connection with the whole charge of the court and in our opinion the criticisms point out no material error that could have injured the appellant. In this connection we call attention to the fact, as stated above, that all these charges were considered and passed upon on the previous appeal of this case and they were held therein to be correct. We call attention, too, in this connection, to the fact that the appellant neither in this trial nor in the other, made any exceptions to the charge of the court at the time it was delivered, nor did he ask any special charge on any feature of the case to correct any supposed error of the court. The criticisms now raised by him of the charge as stated above, were first made in an amended motion for new trial. While an appellant under the statute can make for the first time objections to a charge in a motion for new trial and if they are of sufficient gravity this court will reverse, yet, as the statute, article 723, Code Criminal Procedure, prohibits this court from reversing "unless the error appearing from the record is calculated to injure the rights of the defendant" we can not help but consider such objections made so late, not of the same gravity and not so considered by the appellant and the lower court at the time of the trial, else he would have called the attention of the court thereto at the time by exceptions to the charge in those respects or by special charges correcting such omissions or commissions in the charge. So viewing the matter, it is our opinion that none of appellant's exceptions to said charge point out any reversible error.

Another complaint is that the court erred in not charging the jury limiting the effect of the testimony introduced by appellant himself to show that some week or ten days before the killing the appellant had had a difficulty with a woman and had slapped her jaws. This testimony was introduced by appellant himself. He asked no charge limiting it for any particular purpose. It is well established in this State that the testimony does not have to be limited where it can only be used by the jury for the purpose for which it was introduced and when the jury can not be misled thereby on the main case. Leeper v. State, 29 Texas Crim. App., 63; Franklin v. State, 38 Texas Crim. Rep., 346; Sue v. State, 52 Texas Crim. Rep., 122; Rice v. State, 54 Texas Crim. Rep., 149; Wright v. State, 56 Texas Crim. Rep., 353; Malcek v. State, 33 Texas Crim. Rep., 14; Brown v. State, 41 Texas Crim. Rep., 232; Harold v. State, 46 Texas Crim. Rep., 568. We can not see how it is possible that the testimony introduced by appellant himself which shows that some week or ten days before the killing with which the deceased was in no way then, or at any other time, connected, could possibly have been misconstrued by the jury to the injury of the appellant when he was charged with the murder of the deceased. The court did not err in this particular complained of.

There being no reversible error and the evidence being amply sufficient to sustain the conviction, the judgment will be affirmed.

*Affirmed.*

[Rehearing denied May 8, 1912.—Reporter.]